**CENTER FOR FAIR PUBLIC POLICY,** an Arizona non-profit corporation; Dream Palace, a dba of Liberty Entertainment Group, L.L.C., an Arizona Limited Liability Company; Castle Superstore Corporation, an Arizona corporation, Plaintiffs–Appellants,

and

**L.J. Concepts, Inc., Plaintiff,**

v.

**MARICOPA COUNTY, ARIZONA;** Richard M. Romley, in his official capacity as Maricopa County Attorney; City of Phoenix, a municipal corporation, Defendants–Appellees,

State of Arizona, Intervenor–Appellee,

and

City of Glendale, Defendant.

**LJ Concepts, Inc., an Arizona corporation; Stummer LLC, Inc., an Arizona corporation; Mid–City Enterprises, Inc., an Arizona corporation; B.C. Books, Inc., a Delaware corporation; Michael J. Ahearn, Plaintiffs–Appellants,**

State of Arizona, Intervenor–Appellee,

and

**Center for Fair Public Policy, an Arizona non-profit corporation; Dream Palace, an Arizona Limited Liability Company dba Liberty Entertainment Group, L.L.C.; Castle Superstore Corporation, an Arizona corporation; Daniel Ray Golladay, Plaintiffs,**

v.

**City of Phoenix, a municipal corporation; Maricopa County, Arizona; Richard Romley, in his official capacity as Maricopa County Attorney; City**

---

**70.** *See Rich,* 187 F.3d at 1068.

**71.** *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.

of Phoenix, a municipal corporation; City of Glendale, an Arizona municipal corporation, Defendants–Appellees.

Nos. 00–16858, 00–16905.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 2003.

Filed July 28, 2003.

G. Randall Garrou, Weston, Garrou & DeWitt, Los Angeles, CA, argued the cause and filed briefs for appellant Center for Fair Public Policy, et al. John H. Weston was on the briefs.

Richard J. Hertzberg, Phoenix, AZ, argued the cause and filed briefs for appellants L.J. Concepts, et al.

Scott E. Boehm, Copple, Chamberlin, Boehm & Murphy, P.C., Phoenix, AZ, argued the cause and filed briefs for the defendants. Janet A. Napolitano, Arizona Attorney General, and Thomas J. Dennis, Assistant Arizona Attorney General, Phoenix, AZ, were on the briefs. James H. Hays, Assistant City Attorney for the City of Phoenix, and James M. Flenner, Assistant City Attorney for the City of Glendale, were also on the briefs.

Before CANBY, O'SCANNLAIN, and W. FLETCHER, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Dissent by Judge CANBY.

## OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether a state statute prohibiting sexually-oriented businesses from operating during late night hours passes muster under the First Amendment.

### I

The Arizona statute at issue here requires all sexually-oriented businesses[1] to close "between the hours of 1.00 a.m. and 8:00 a.m. on Monday through Saturday and between the hours of 1:00 a.m. and 12:00 noon on Sunday." Ariz.Rev.Stat. § 13–1422(A). A sexually-oriented business is an "adult arcade, adult bookstore or video store, adult cabaret, adult motion picture theater, adult theater, escort agency or nude model studio...." *Id.* Violation of § 13–1422(A) is a class one misdemeanor. *Id.* § 13–1422(B).

Section 13–1422 was originally proposed to the Arizona legislature in 1998 as Senate Bill 1367. The bill was assigned to the House of Representatives' Government Reform and States' Rights Committee and to the Senate Family Services Committee, and public hearings were held in both bodies. While the original bill passed in the Senate, it was voted down in the Arizona House Rules Committee.

At the same time, Senate Bill 1162, a bill authorizing Arizona counties to develop land-use regulations within their respective jurisdictions, and which included an authorization to license and to regulate sexually-oriented businesses operating within unincorporated areas, was winding its way through the legislature. When original Senate Bill 1367 failed in the House Rules Committee, its provisions were added verbatim as an amendment to the more comprehensive Senate Bill 1162. Amended Senate Bill 1162 passed both the House and the Senate, and was signed into law on June 1, 1998, and became effective on August 21, 1998.

The record before the Arizona legislature prior to § 13–1422's enactment consisted of testimonial evidence from several individuals, as well as some limited documentary evidence with respect to the need for restricting sexually-oriented businesses' hours of operation.

Russell Smolden and Jane Lewis both testified before House and Senate committees. These individuals worked for mixed-use real estate parks located in Tempe and Phoenix, and both testified that nearby sexually-oriented businesses were disruptive of their attempts to attract new employers to the parks, and prospective employers expressed concern for their employees who worked night-shifts. They testified that limiting the hours of operation of the nearby sexually-oriented businesses would aid in their efforts to attract employers to the parks.

Scott Bergthold, the executive director and general counsel to the National Family Legal Foundation ("NFLF"), testified that similar hours of operation restrictions had been upheld as constitutional by federal courts. He also testified that approximately fifteen studies had been conducted concerning the negative secondary effects associated with sexually-oriented businesses. Those studies documented increased crime, prostitution, public sexual indecency and health risks associated with HIV and AIDS transmission.

Donna Neil, co-founder of a group known as the Neighborhood Activist Inter-

1. We adopt the nomenclature used in the statute for the sake of convenience.

linked Empowerment Movement ("Nail'em"), testified that, each weekend, parents in her neighborhood cleared up litter emanating from neighborhood sexually-oriented businesses. She also testified that the local school's playground was fenced and closed to neighborhood children on weekends due to incidents of prostitution on school grounds. She stated that the neighborhood had experienced an increase in crime—specifically drug arrests and assaults—associated with sexually-oriented businesses. Finally, Bridget Mannock, a neighborhood legislative liaison for the City of Phoenix testified that a state-level hours of operation regulation was necessary due to the limited nature of the local municipalities' authority.

Some documentary evidence was presented to the Arizona legislature. First, there is a letter from the NFLF addressed to the House Government Reform and States' Rights Committee. The letter discussed the acute problems associated with sexually-oriented businesses as documented in a report from the Denver Metropolitan Police Department, which concluded that sexually-oriented businesses "disproportionately deplete police time and resources during the overnight hours." The Denver report itself was not presented to the Committee. The letter also discussed the fact that the proposed regulation was constitutional because it was a reasonable time, place and manner restriction on speech. Second, there is a letter from the NFLF to House members, discussing ostensibly the same themes raised in the letter to the House Committee. Finally, there is a "fact sheet" prepared by the NFLF, which noted that every study conducted established the negative secondary effects associated with sexually-oriented businesses. In particular, the fact sheet noted a 1989 report prepared by the Minnesota Attorney General's office which concluded that surrounding communities are negatively impacted by 24–hour–a–day or late night operation of sexually-oriented businesses. None of the reports discussed in the fact sheet were presented to the legislature. The fact sheet also contained a discussion of the constitutionality of the proposed restrictions.

The plaintiffs in this action are owners and operators of sexually-oriented businesses in Arizona. They include nude-dancer clubs, x-rated video arcades and sellers of sexually-related magazines and paraphernalia. Some of these businesses were open 24–hours a day prior to enactment of § 13–1422. Two separate groups of plaintiffs—the L.J. Concepts, Inc. plaintiffs and the Center for Fair Public Policy plaintiffs (collectively "Fair Public Policy")—filed suit on September 1, 1998 in federal district court, alleging that § 13–1422 violates the First Amendment, and seeking declaratory and injunctive relief. The cases were consolidated and assigned to Judge Carroll, and a briefing schedule with respect to the propriety of issuing a preliminary injunction was agreed upon.

While the parties were briefing the preliminary injunction issue, the state defendants placed in the district court record copies of fourteen studies on the negative secondary effects associated with adult-oriented businesses. Fair Public Policy objected because these studies were not before the legislature prior to § 13–1422's enactment.

On September 30, 1999, Judge Carroll denied Fair Public Policy's application for a preliminary injunction. The district court found that the statute was constitutional under the Supreme Court's decision in *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), and that there was sufficient pre-enactment evidence, without regard to the studies introduced during the litigation, to support the statute's enactment. The plaintiff groups filed notices of appeal from

Judge Carroll's decision, and those appeals were duly consolidated by this court. We affirmed the district court's decision not to issue a preliminary injunction. *See L.J. Concepts v. City of Phoenix,* No. 99–17270, 2000 U.S.App. LEXIS 5906, at *3 (9th Cir. March 30, 2000). On September 13, 1999, the district court denied the plaintiffs' request for a permanent injunction and declaratory relief, and entered judgment for the defendants. Plaintiffs timely appealed.

## II

While the constitutionality of hours of operation restrictions on sexually-oriented businesses is an issue of first impression in this circuit, six other circuits have had occasion to consider similar restrictions, and all have found such restrictions to be constitutional under the "secondary effects" test first enunciated by the Supreme Court in *Renton. See DiMa Corp. v. Town of Hallie,* 185 F.3d 823 (7th Cir. 1999); *Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358 (11th Cir. 1999); *Richland Bookmart Inc. v. Nichols,* 137 F.3d 435 (6th Cir.1998); *Nat'l Amusements Inc. v. Town of Dedham,* 43 F.3d 731 (1st Cir.1995); *Mitchell v. Comm'n on Adult Enter. Est. of the State of Delaware,* 10 F.3d 123(3d Cir.1993); *Star Satellite, Inc. v. City of Biloxi,* 779 F.2d 1074 (5th Cir.1986).

In *Renton,* the Supreme Court considered a constitutional challenge to a zoning ordinance prohibiting adult movie theaters from locating within 1,000 feet of any residential zone. 475 U.S. at 43, 106 S.Ct. 925. Citing its decision in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the Court established a now familiar three-part analytical framework for evaluating the constitutionality of sexually-oriented business regulations, or what Professor Tribe has described rather aptly as "erogenous zoning laws." Laurence H. Tribe, American Constitutional Law 934 (2d ed.1988).

First, the Court asked whether the ordinance was a complete ban on adult theaters. *Id.* at 46, 106 S.Ct. 925. Because the ordinance was not a total ban, it was properly analyzed as a time, place and manner regulation. *Id.* Second, the Court considered whether the ordinance was content neutral or content based. The Court held that, because the ordinance at issue was aimed not at the content of the films shown at adult theaters, but rather at the secondary effects such theaters have on the surrounding community, it was properly classified as content neutral. *Id.* at 47, 106 S.Ct. 925. Third, given this finding, the final step is to ask whether the ordinance is designed to serve a substantial government interest and that reasonable alternative avenues of communication remain available. *Id.* at 50, 106 S.Ct. 925. With respect to the burden of proof at this stage, the Court held that the First Amendment "does not require a city ... to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* at 51–52, 106 S.Ct. 925.

### A

The Supreme Court recently reaffirmed the *Renton* framework in *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002). At issue in that case was a Los Angeles ordinance prohibiting multiple adult entertainment businesses from operating in the same building. In enacting this ordinance, the city primarily relied on a 1977 study conducted by the city's planning department, which indicated that between 1965 and 1975, crime had grown at a much higher rate in Hollywood, which had the largest concentration of adult establishments in the city, than in the city as a whole. *Id.* at 435, 122 S.Ct. 1728 (plurality

opinion). Under the third prong of the *Renton* analysis, we had found that the 1977 study did not reasonably support the inference that a concentration of adult operations in the same building produced higher crime rates. *See Alameda Books, Inc. v. City of Los Angeles,* 222 F.3d 719, 725 (9th Cir.2000). This was so, we held, because the study focused on the effect of a concentration of establishments on a given *area,* not on the effect of a concentration of establishments within a single building. *Id.* It was therefore unreasonable, we opined, for the city to infer that absent its regulation, a combination of establishments within a single building would have harmful secondary effects on the surrounding community. *Id.*

The Supreme Court reversed. Writing for a four-judge plurality, Justice O'Connor wrote that we had erred in requiring the city to "prove that its theory about a concentration of adult operations ... is a *necessary consequence* of the 1977 study." 535 U.S. at 437, 122 S.Ct. 1728 (emphasis added). Justice O'Connor explained,

> In *Renton,* we specifically refused to set such a high bar for municipalities that want to address merely the secondary effects of protected speech. We held that a municipality may rely on any evidence that is reasonably believed to be relevant for demonstrating a connection between speech and a substantial, independent government interest. This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton.* If plaintiffs succeed in casting doubt on a municipality's ratio-

nale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies the ordinance.

*Id.* at 438–39, 122 S.Ct. 1728 (internal citation and quotation omitted).

The plurality made two other points of clarification with respect to the evidentiary burden under *Renton.* First, it rejected the notion that the state is required to come forward with empirical data in support of its ordinance. "Such a requirement," wrote Justice O'Connor, "would go too far in undermining our settled position that municipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects of protected speech." *Id.* at 439, 122 S.Ct. 1728.

Second, the plurality made it clear that "the inquiry into whether a [sexually-oriented business regulation] is content neutral" and the "inquiry into whether it is designed to serve a substantial government interest" are separate and distinct. *Id.* at 440, 122 S.Ct. 1728 (quotation and internal citation omitted). Justice O'Connor explained,

> The former requires courts to verify that the "predominate concerns" motivating the ordinance "were with the secondary effects of adult [speech], and not with the content of adult [speech]." The latter inquiry goes one step further and asks whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance. Only at this stage did *Renton* contemplate that courts would examine evidence concerning regulated speech and secondary effects.

*Id.* at 440–41, 122 S.Ct. 1728 (quoting *Renton,* 475 U.S. at 47, 106 S.Ct. 925) (alterations in original).

1

Writing separately, Justice Kennedy concurred in the judgment. Because his concurrence is the narrowest opinion joining in the judgment of the Court, Justice Kennedy's concurrence may be regarded as the controlling opinion. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1976) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.") (citation and internal quotation omitted).

In his separate concurrence, Justice Kennedy agreed with the plurality that "the central holding of *Renton* is sound: A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny." 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring). Justice Kennedy wrote separately, he explained, for two distinct reasons.

First, he agreed with the four dissenting justices that sexually-oriented business regulations should no longer be designated as "content neutral" when they were clearly not. Whether a statute is content based or content neutral, he explained, "is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Id.* Classifying regulations of the type at issue in *Renton* and *Alameda Books* as content neutral, explained Justice Kennedy, was an unhelpful legal fiction which only leads to doctrinal incoherence; these types of ordinances "are content based and we should call them so." *Id.*

Second, while Justice Kennedy agreed with the plurality that *Renton* remained sound, he wrote separately because in his view, the plurality's application of *Renton* "might constitute a subtle expansion" of *Renton*'s principles with which he did not agree. *Id.* at 445, 122 S.Ct. 1728. He explained that, in his view, the question presented—whether or not the city could rely on judicially approved statutory precedent from other jurisdictions in support of the regulation—"is actually two questions." 535 U.S. at 449, 122 S.Ct. 1728.

> First, what proposition does a city need to advance in order to sustain a secondary-effects ordinance? Second, how much evidence is required to support the proposition? The plurality skips to the second question and gives the correct answer; but in my view more attention must be given to the first.

*Id.* With regard to the first question—the proposition that the city needs to advance—Justice Kennedy wrote that "a city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Id.* The analysis has to address "how speech will fare under the ... ordinance." *Id.* at 450, 122 S.Ct. 1728. Because of this, "it does not suffice to say that inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects." *Id.* The rationale, therefore, has to be that a proposed secondary-effects ordinance will leave "the quantity of speech ... substantially undiminished, and that total secondary effects will be significantly reduced." *Id.* at 451, 122 S.Ct. 1728. To illustrate this proportionality requirement, Justice Kennedy took the facts of the case under consideration,

> If two adult businesses are under the same roof, an ordinance requiring them to separate will have one of two results: One business will either move elsewhere or close. The city's premise cannot be

the latter. It is true that cutting adult speech in half would probably reduce secondary effects proportionally. But ... a promised proportional reduction does not suffice.... The premise ... must be that businesses ... will for the most part disperse rather than shut down.

*Id.* at 451, 122 S.Ct. 1728.

Only *after* identifying "the proposition to be proved" can a court seek to answer "the second part of the question presented; is there sufficient evidence to support the proposition?" *Id.* As to the state's evidentiary burden, Justice Kennedy agreed fully with the plurality that "very little evidence is required." *Id.* The "reasonable reliance" standard is necessary, he wrote, because "[a]s a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners." *Id.*

### 2

Going straight for the jugular, Fair Public Policy pounces on Justice Kennedy's concurrence in *Alameda Books* and argues that there is no way to reconcile the statute at issue here with his "proportionality" requirement. It argues that sexually-oriented businesses draw a fair amount of their patronage in the evening and late night hours—nude dancing establishments are hardly doing a roaring trade after dawn. The ordinance shuts these establishments down during the late night hours, and therefore it cannot be, as Justice Kennedy would require, that "the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced." *Id.* This is precisely the scenario Justice Kennedy warned against, Fair Public Policy argues, because it is *only* by reducing the enjoyment of protected expression that the state reduces secondary effects. Because the statute cannot be squared with Justice Kennedy's proportionality analysis, and

because his is the controlling opinion under *Marks,* it urges that the statute must be invalid under the First Amendment.

#### a

Fair Public Policy's argument is a forceful one, but there are several reasons that lead us to conclude that Justice Kennedy never intended a heightened proportionality requirement to apply in this particular context. First and foremost, the argument that Justice Kennedy meant to invalidate an hours of operation restriction of the type at issue here cannot be squared with his insistence that "the central holding of *Renton* remains sound." *Id.* at 448, 122 S.Ct. 1728. Limiting the negative externalities associated with certain land uses, as a properly crafted secondary effects ordinance is designed to do, is a "prima facie legitimate purpose," and for this reason "such laws do not automatically raise the specter of impermissible content discrimination." *Id.* at 449, 122 S.Ct. 1728. Justice Kennedy quite clearly agreed with the plurality that laws "designed to decrease secondary effects ... should be subject to intermediate rather than strict scrutiny." *Id.* at 449, 122 S.Ct. 1728. He wrote separately to guard against "a subtle expansion" of *Renton,* and *not,* as Fair Public Policy would have it, to signal a fundamental shift in the *Renton* framework. Given his emphatic reaffirmance of *Renton,* we are not persuaded that Justice Kennedy meant to precipitate a sea change in this particular corner of First Amendment law. This is especially so given that the circuit courts have thus far been unanimous in upholding similar or even more severe hours of operation restrictions under *Renton. See DiMa Corp.,* 185 F.3d 823; *Lady J. Lingerie, Inc.,* 176 F.3d at 1358; *Richland Bookmart Inc.,* 137 F.3d at 435; *Nat'l Amusements Inc.,* 43 F.3d at 731; *Mitchell,* 10 F.3d at 123; *Star Satellite, Inc.,* 779 F.2d at 1074. We

read nothing in Justice Kennedy's separate opinion signaling disapproval with these results.

### b

Justice Kennedy's proportionality analysis also needs to be understood in light of the particular species of secondary effects law that the Court was considering. The ordinance at issue in *Alameda Books* was a classic erogenous zoning ordinance whereby the city was restricting certain land uses. It was a "place" restriction, and Justice Kennedy's proportionality analysis is easy enough to understand and to apply to such a typical zoning ordinance. The city's rationale cannot be that when it requires businesses to disperse (or to concentrate), it will force the closure of a number of those businesses, thereby reducing the quantity of protected speech. In contrast, we are faced with a quite different species of secondary effects law—a "time" restriction that forces the closure of *all* adult entertainment establishments for a limited time. We accept the proposition that such establishments tend to be patronized in the evening and late at night. Given this, the application of Justice Kennedy's proportionality analysis to this particular type of secondary effects law would invalidate *all* such laws, and we are satisfied that he never intended such a result. His proportionality requirement was simply not designed with this particular type of restriction in mind.

### c

Finally, Fair Public Policy's argument that Justice Kennedy's *Alameda Books* opinion presents a new and different approach to the constitutional analysis of secondary effects law is inconsistent with the weight of authority in the wake of that decision. Courts have routinely upheld properly crafted secondary effects ordinances supported by a proper record in the wake of *Alameda Books,* and have

explicitly stated that Justice Kennedy's separate decision did little, if indeed anything, to the traditional *Renton* framework. *See Z.J. Gifts D–4, LLC v. City of Littleton,* 311 F.3d 1220, 1239 n. 15 (10th Cir.2002) (seeing "nothing in ... *Alameda Books* that requires reconsideration" of the traditional *Renton* framework); *World Wide Video of Wash., Inc. v. City of Spokane,* 227 F.Supp.2d 1143, ―― (E.D.Wash.2002) ("While *Alameda Books* may clarify existing precedent, this court is not persuaded that it fundamentally alters the legal landscape regarding adult entertainment zoning ordinances."). As the Seventh Circuit explained, "[t]he differences between Justice Kennedy's concurrence and the plurality opinion are ... quite subtle." *Ben's Bar, Inc. v. Village of Somerset,* 316 F.3d 702, 721(7th Cir.2003).

> Justice Kennedy's position is not that a municipality must *prove* the efficacy of its rationale for reducing secondary effects *prior to* implementation, as Justice Souter and the other dissenters would require, *see generally Alameda Books,* 122 S.Ct. at 1744–51; but that a municipality's *rationale* must be *premised* on the theory that it *"may* reduce the costs of secondary effects without substantially reducing speech."

*Id.* (emphasis in original) (quoting *Alameda Books,* 535 U.S. at 450, 122 S.Ct. 1728 (Kennedy, J., concurring)). Indeed, the plurality in *Alameda Books* considered Justice Kennedy's proportionality analysis "unobjectionable," and "simply a reformulation of the requirement that an ordinance warrants intermediate scrutiny only if it is a time, place, and manner regulation and not a ban." 535 U.S. at 443, 122 S.Ct. 1728 (plurality opinion).

### d

In any event, to the extent Justice Kennedy's concurrence worked any change in the traditional *Renton* framework, we are satisfied that his proportionality analysis

does not apply to the particular type of regulation that we deal with here, and we reject Fair Public Policy's argument that the statute must be invalidated on the basis of his opinion. Because five members of the Supreme Court agreed that "the central holding of *Renton* is sound" we apply the traditional three-part test in order to determine the constitutionality of § 13–1422.

## B

Our first task under *Renton*, then, is to determine whether the statute amounts to a complete ban on protected expressive activity. *Renton*, 475 U.S. at 46, 106 S.Ct. 925; *Alameda Books*, 535 U.S. at 434, 122 S.Ct. 1728 (plurality opinion).

### 1

■ The statute at issue here is obviously not a complete ban. It is a classic time, place or manner restriction, prohibiting sexually-oriented businesses from operating during certain nighttime hours, and until noon on Sundays. The businesses may remain open the remainder of the time, 115 hours in a 168 hour week, or approximately 5,980 hours in a calendar year. "The ordinance is therefore properly analyzed as a time, place, and manner regulation." *Renton*, 475 U.S. at 46, 106 S.Ct. 925.

### 2

Next, we must determine what level of scrutiny to apply. Traditionally, the Court has invoked the content based/content neutral distinction as the basis for determining which level of scrutiny to apply. *See Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("Our precedents ... apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content.... In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny.").

■ A regulation restricting the hours of operation of a sexually-oriented business is quite obviously content based. "[W]hether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Alameda Books*, 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring). The Arizona statute is content based on its face because whether an establishment falls within its parameters, and is therefore subject to sanction for violating the prohibition against operating during nighttime hours, can only be determined by reference to the content of the expression inside it. *See Schultz v. City of Cumberland*, 228 F.3d 831, 843–44 (7th Cir.2000) ("[A]n ordinance that regulates only adult-entertainment businesses singles out adult-oriented establishments for different treatment based on the content of the materials they sell or display.") (internal quotation omitted). Because the statute is content based, Fair Public Policy argues that strict scrutiny should apply. Such argument is misplaced.

■ The Supreme Court has clearly carved out sexual and pornographic speech as one type of speech than can be subject to reasonable restriction. "Generally, the government has no power to restrict speech based on content, but there are exceptions to this rule." *Alameda Books*, 535 U.S. at 448, 122 S.Ct. 1728(Kennedy, J., concurring). The speech and expressive activity at issue here is one such exception; the content based/content neutral distinction simply does not fit in this context. In fine, so long as the regulation is designed to combat the secondary effects of such establishments on the surrounding community, "namely at crime rates, property values, and the quality of the city's neighborhoods," *Alameda Books*,

535 U.S. at 434, 122 S.Ct. 1728 (plurality opinion), then it is subject to intermediate scrutiny. *See also Colacurcio v. City of Kent,* 163 F.3d 545, 551(9th Cir.1998) (explaining that if "the predominant purpose" of an ordinance is ameliorating secondary effects associated with sexually-oriented businesses, then it is subject to intermediate scrutiny).

■ "We will look to the full record" to determine whether the purpose of the statute is to ameliorate secondary effects. *Id.* at 552. "In so doing, we will rely on all 'objective indicators of intent,' including the 'face of the statute, the effect of the statute, comparison to prior law, facts surrounding enactment, the stated purpose, and the record of proceedings.'" *Id.* (quoting *City of Las Vegas v. Foley,* 747 F.2d 1294, 1297(9th Cir.1984)).

a

■ In this context, the first thing to note about § 13–1422 is that it regulates both establishments protected by the First Amendment—adult bookstores, video stores, cabarets, motion picture theaters and theaters—and businesses that have no such protection—escort agencies,[2] for example, suggesting that the state's purpose in enacting the statute was unrelated to the suppression of expression. In *Alameda Books,* Justice Kennedy noted the fact that the ordinance at issue was "not limited to expressive activities. It also extends ... to massage parlors, which the city has found to cause similar secondary effects." 535 U.S. at 447, 122 S.Ct. 1728 (Kennedy, J., concurring).

Furthermore, the hours regulation was passed as an amendment to Senate Bill 1162, a broader bill authorizing counties to develop comprehensive land-use regulations within their respective jurisdictions, and to promote the social value of the land as a whole. *See* Ariz.Rev.Stat. § 11–821 ("The county plan shall be made with the general purpose of guiding and accomplishing a coordinated, adjusted and harmonious development of the area of jurisdiction."). This is yet another objective indicator that the purpose of the statute was to combat the negative secondary effects associated with sexually-oriented businesses. *See Alameda Books,* 535 U.S. at 447, 122 S.Ct. 1728 (Kennedy, J., concurring) (fact that the ordinance at issue was "one part of an elaborate web of land-use regulations .... suggests that the ordinance is more in the nature of a typical land-use restriction and less in the nature of a law suppressing speech").

There are other "objective indicators of intent" on this record. *Foley,* 747 F.2d at 1297. For example, the "fact sheet" prepared by the NFLF stated that a statewide hours regulation was necessary to curb the problems associated with sexually-oriented business, which "according to law enforcement, include noise, traffic, unlawful public sexual activity, prostitution and drug trafficking." Moreover, the majority of comments made by legislators when the bill was under consideration focused on the secondary effects associated with sexually-oriented businesses. In short, our examination of the record as a whole, *see Colacurcio,* 163 F.3d at 552, indicates that the predominant purpose in enacting this provision was to ameliorate the secondary effects associated with the regulated establishments.

---

**2.** An "escort agency" is "a person or business association that furnishes, offers to furnish or advertises the furnishing of escorts as one of its primary business purposes for any fee, tip or other consideration." Ariz.Rev.Stat. § 13–1422(D)(7). An "escort" is "a person who for consideration agrees or offers to act as a companion, guide or date for another person or who agrees or offers to privately model lingerie or to privately perform a striptease for another person." *Id.* § 13–1422(D)(6).

### b

■ Fair Public Policy argues that there is no pre-enactment evidence on which the legislature could rely to support its conclusion that the restrictions are warranted. But this argument confuses two separate issues which the Supreme Court has made clear need to be carefully distinguished. The 'predominant purpose' inquiry is separate and independent from the inquiry into whether the statute is designed to serve a substantial government interest. Only with respect to the latter inquiry "did *Renton* contemplate that courts would examine evidence concerning regulated speech and secondary effects." *Alameda Books*, 535 U.S. at 441, 122 S.Ct. 1728 (plurality opinion). In short, Fair Public Policy's argument is one that was specifically considered and rejected by the Supreme Court in *Alameda Books*. Because our examination of the record as a whole indicates that, in enacting the hours of operation restriction, the Arizona legislature was concerned with curbing the negative secondary effects associated with such businesses, intermediate scrutiny applies.

### 3

■ The statute will be upheld if it is designed to serve a substantial government interest, is narrowly tailored to serve that interest, and does not unreasonably limit alternative avenues of communication. *Renton*, 475 U.S. at 50, 106 S.Ct. 925; *Colacurcio*, 163 F.3d at 551.

### a

■ It is beyond peradventure at this point in the development of the doctrine that a state's interest in curbing the secondary effects associated with adult entertainment establishments is substantial. *See Young*, 427 U.S. at 71, 96 S.Ct. 2440 (city's "interest in attempting to preserve the quality of urban life is one that must be accorded high respect"); *Renton*, 475 U.S. at 50, 106 S.Ct. 925 (noting the "vital government interests at stake"); *Alameda Books*, 535 U.S. at 435, 122 S.Ct. 1728 ("reducing crime is a substantial government interest").

Here, Arizona's specific interest is in reducing the secondary effects associated with late night operations of sexually-oriented businesses, which include noise, traffic, unlawful public sexual activity, prostitution and drug trafficking. Each of our sister circuits to have considered similar prohibitions has recognized that such an interest is a substantial one. *See, e.g., National Amusements, Inc.*, 43 F.3d at 741(city has a substantial interest in preserving peace and tranquility for citizens during late evening hours); *Mitchell*, 10 F.3d at 133 (state's interest in preserving character and preventing deterioration of neighborhoods substantial); *Richland Bookmart, Inc.*, 137 F.3d at 440–41 (deterring "prostitution in the neighborhood at night or the creation of 'drug corners' on the surrounding streets" a substantial government interest).

The critical issue, of course, is whether the state has met its burden under *Renton* of coming forward with evidence that "demonstrate[s] a connection between the speech regulated ... and the secondary effects that motivated the adoption of the ordinance." *Alameda Books*, 535 U.S. at 441, 122 S.Ct. 1728(plurality opinion).[3]

---

**3.** The parties argue at great length over whether or not we may consider the contents of the studies that document the secondary effects associated with sexually-oriented businesses, and that were placed in the district court record during the course of these proceedings. While the Arizona legislature was briefed on these studies, the actual studies themselves were not before the legislature prior to § 13–1422's enactment, and it is therefore so-called post-enactment evidence.

The pre-enactment record is a slim one, and consists of certain letters from NFLF documenting in a general sense the "acute problems" associated with sexually-oriented businesses, and discussing a Denver, Colorado study, which concluded that such establishments disproportionately deplete police time and resources during overnight hours. A "fact sheet" distributed to legislatures cited fourteen studies that documented the secondary-effects associated with adult entertainment establishments, and in particular it noted a Minnesota study establishing specific secondary effects associated with sexually-oriented businesses during overnight hours. The Arizona legislature also held public hearings and considered certain testimonial evidence, including evidence that prospective employers were concerned for the safety of their night-shift employees, and testimony from a neighborhood activist concerning the litter, prostitution, and drug use in her neighborhood.

All of the evidence the Arizona legislature considered fairly supports its rationale that prohibiting sexually-oriented businesses from operating in the late night hours will lead to a reduction in secondary effects, and generally enhance the quality of life for Arizona citizens. A comparison of the record before the Arizona legislature to the record amassed in prior cases that have been the subject of judicial scrutiny may be helpful in determining whether the state has carried its burden in this case. The quantum and quality of evidence here compares unfavorably to two of the circuit court cases to have considered similar restrictions. The city ordinance upheld by the Fifth Circuit was "adopted after extensive study" by the city. *Star Satellite, Inc.*, 779 F.2d at 1077–78. No such study was done here. Instead, Arizona relied on the experiences of other communities in support of its rationale. *But see Renton*, 475 U.S. at 50, 106 S.Ct. 925(rejecting the argument that it was necessary for a city to conduct its own studies). The ordinance at issue in *Schultz v. City of Cumberland*, 228 F.3d 831, 846 (7th Cir.2000) was adopted after the city "collected and reviewed a host of studies," and here, while the legislature was *briefed* with respect to certain studies, no studies were put before the legislature prior to enactment.

The record compares favorably to the evidence considered in several other cases, however. In *Mitchell*, lawmakers "received no documents or any sworn testimony in support of the bill" and "the General Assembly did not conduct public hearings." 10 F.3d at 133. Nonetheless the Third Circuit held that the state had met its evidentiary burden under *Renton*. *See also DiMa Corp.*, 185 F.3d at 830–31 (city relied on factual record supporting another city's ordinance); *Ben Rich Trading Inc.*, 126 F.3d at 161 (only thing city relied on was evidence presented to state legislature two years previously).

However, in *Alameda Books* the Supreme Court specifically contemplated that the state could indeed rely on post-enactment evidence in support of its position, *but only* if the plaintiffs succeed in casting doubt on the state's rationale. *See Alameda Books*, 535 U.S. at 441, 122 S.Ct. 1728(if "the burden shifts back" to the state, then state can "*supplement* the record with evidence renewing support for a theory that justifies the ordinance" (emphasis added)); *see also Mitchell*, 10 F.3d at 136 (examining "pre-enactment and post-enactment evidence" in determining whether state met its burden); *DiMa Corp.*, 185 F.3d at 829–30 (holding that "a municipality may make a record for summary judgment or at trial with evidence that it may not have had when it enacted the ordinance"); *Ben Rich Trading Inc. v. City of Vineland*, 126 F.3d 155, 161 (3d Cir.1997) (discussing city's burden of production and noting that "a record could be established in the court after legislation is passed and challenged").

The record here is hardly overwhelming, but it does not have to be. *See Alameda Books,* 535 U.S. at 451, 122 S.Ct. 1728,(Kennedy, J., concurring) ("very little evidence is required" to justify a secondary effects ordinance). The question is whether the Arizona legislature relied on evidence "reasonably believed to be relevant" in demonstrating a connection between its stated rationale and the protected speech, and we hold that it has done that here. The Arizona Senate and House held public hearings at which lawmakers heard citizen testimony concerning the late night operation of sexually-oriented businesses, and were briefed on several studies documenting secondary effects, and two of those studies were specific to late night operations. *See Renton,* 475 U.S. at 50, 106 S.Ct. 925(reasonable for regulators to rely on experiences and studies of other cities, as well as legal decisions upholding similar regulations). That evidence is both reasonable and relevant, and compares favorably with the evidence presented in other cases.

i

Under *Alameda Books,* the burden now shifts to Fair Public Policy to "cast direct doubt on [the state's] rationale, either by demonstrating that the [state's] evidence does not support its rationale or by furnishing evidence that disputes the [state's] factual findings." 535 U.S. at 441, 122 S.Ct. 1728 (plurality opinion). Fair Public Policy's primary argument on appeal is that the evidence before the Arizona legislature consisted of "irrelevant anecdotes" and "isolated" incidents, and that testimonial evidence is not "real" evidence. If Fair Public Policy means to argue that such evidence is improper, its argument is erroneous, and simply misconstrues the nature of the legislative process. Legislative committees are not judicial tribunals, and they are not bound by rules of

evidence. As the First Circuit explained when confronted with a similar argument,

A legislative body can act without first acquiring irrefutable proof. In other words, lawmakers need not bury each piece of described trash before acting to combat litter, or confirm each honking horn before acting to abate noise levels. Instead, a legislative body, acting in furtherance of the public interest, is entitled to rely on whatever evidence it reasonably believes to be relevant to the problem at hand.

*National Amusements, Inc.,* 43 F.3d at 742(internal quotation and citations omitted); *see also World Wide Video of Wash.,* 227 F.Supp.2d 1143 ("[A]necdotal evidence and reported experience can be as telling as statistical data and can serve as a legitimate basis for finding negative secondary effects.") (quoting *Stringfellow's of N.Y., Ltd. v. City of New York,* 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407, 417 (1998)).

To the extent Fair Public Policy argues that the state needs to come forward with empirical data in support of its rationale, that argument was specifically rejected in *Alameda Books.* 535 U.S. at 439, 122 S.Ct. 1728 (plurality opinion) ("Such a requirement would go too far in undermining our settled position that municipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects of protected speech.") (internal quotation omitted); *see also Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 584, 111 S.Ct. 2456, 115 L.Ed.2d 504 (Souter, J., concurring) ("legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects").

Fair Public Policy has failed to cast doubt on the state's theory, or on the evidence the state relied on in support of that theory. "Precedent ... commands

that courts should not stray from a deferential standard in these contexts, even when First Amendment rights are implicated through secondary effects." *Charter Comm's, Inc. v. County of Santa Cruz*, 304 F.3d 927, 932 (9th Cir.2002). Since the state relied on evidence that is "reasonably believed to be relevant," *Renton*, 475 U.S. at 52, 106 S.Ct. 925, we are satisfied that it has met its evidentiary burden.

b

■ The narrow tailoring requirement is satisfied so long as the government's asserted interest "would be achieved less effectively absent the regulation." *Colacurcio*, 163 F.3d at 553 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

It appears self-evident that the government's asserted interest—the amelioration of secondary effects associated with late night operation of sexually-oriented businesses, including prostitution, drug use and littering—would be achieved less effectively in the absence of the statute. Fair Public Policy argues that the Arizona legislators did not consider any evidence particular to late night hours, but this assertion is belied by the record. Testimonial evidence was introduced specific to the late night operation of such businesses, and the legislature was briefed on two studies specific to problems associated with nighttime operation of sexually oriented businesses. *See National Amusements, Inc.*, 43 F.3d at 744 ("It is within a government's purview to conclude that such secondary effects as late-night noise and traffic are likely to adhere to all [adult] entertainment.").

Nor does the fact that the statute does not permit such establishments to operate prior to noon on Sundays render it overlybroad. The Eleventh Circuit considered and rejected precisely the same argument in *Lady J. Lingerie*:

[T]he plaintiffs would have us look at the City's reasons for this rule on an hour by hour basis. There is no evidence, they submit, of a substantial government interest to justify requiring adult businesses to close from 10:00 a.m. until noon. This is a clever argument, but it confuses the requirement that a regulation serve a substantial government interest with the requirement that it be narrowly tailored to that end.... If we were to side with the plaintiffs here, the next litigants would argue whether evidence of secondary effects at 6:15 in the morning justifies requiring adult businesses to close at 9:30, or whether evidence from 9:30 justifies requiring them to close at 10:45. That sort of line-drawing is inconsistent with a narrow tailoring requirement that only prohibits regulations that are "substantially broader than necessary."

176 F.3d at 1365 (quoting *Ward*, 491 U.S. at 800, 109 S.Ct. 2746).

Furthermore, all six circuits to have considered hours of operation restrictions such as the one at issue here were confronted with regulations containing special provisions for Sunday closing. Indeed, four circuits have upheld regulations that prohibit Sunday hours altogether. *See Ben Rich Trading*, 126 F.3d at 158; *Schultz*, 228 F.3d at 837; *Star Satellite*, 779 F.2d at 1079; *Richland Bookmart, Inc.*, 137 F.3d at 438. Two other circuits have upheld regulations prohibiting sexually-oriented businesses from operating before noon on Sunday, as here. *See Mitchell*, 10 F.3d at 128; *Lady J. Lingerie*, 176 F.3d at 1365. In short, because Arizona's interest in ameliorating secondary effects "would be achieved less effectively absent the regulation," *Colacurcio*, 163 F.3d at 553 (quotation omitted), it satisfies the narrow tailoring requirement.

### c

■ Finally, the statute must "leave open ample alternative channels for communication." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. "The Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression across the landscape of a particular community or setting." *Colacurcio,* 163 F.3d at 554.

The statute permits the businesses that come within its purview to operate seventeen hours per day Monday through Saturday, and thirteen hours on Sunday, a total of approximately 5,980 hours per year. In *Mitchell,* the Third Circuit found that a similar restriction "allows those who choose to hear, view, or participate publicly in sexually explicit expressive activity more than thirty-six hundred hours per year to do so. We think the Constitution requires no more." 10 F.3d at 139. We find that the statute leaves open "ample alternative channels for communication." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746.

### III

■ As an alternative ground for finding the statute unconstitutional, Fair Public Policy argues that it is unconstitutionally underinclusive. The argument is that the state's decision to close sexually-oriented businesses during late night hours must be assessed in light of other types of business which the state permits to operate at night. According to Fair Public Policy, the state must demonstrate that *greater* late night problems are posed by sexually-oriented businesses than by non-regulated businesses, and if it does not, the statute is underinclusive and is therefore subject to strict scrutiny.

Fair Public Policy's first major problem is that this argument runs straight into the Supreme Court's decision in *Renton.* The adult theater plaintiffs in that case argued that the ordinance at issue was underinclusive because it failed to regulate other kinds of adult businesses that are just as likely to produce secondary effects similar to those produced by adult theaters. *Renton,* 475 U.S. at 52, 106 S.Ct. 925. The Court rejected this argument, holding that simply because the city "chose first to address the potential problems created by one particular kind of adult business in no way suggests that the city has 'singled out' adult theaters for discriminatory treatment." *Id.* at 53, 106 S.Ct. 925.

Fair Public Policy gamely attempts to distinguish *Renton* by pointing out that the Court in *Renton* dealt with a comparison of *one kind* of adult entertainment business with *other kinds* of adult entertainment businesses, whereas their argument here is that the state may not single out the *entire industry* of adult entertainment. As we have previously explained, however, the Supreme Court has consistently stated that so long as the legislature's motive is the amelioration of secondary effects, sexually-oriented businesses may indeed be singled out. As the Supreme Court in *R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), explained,

> [T]he First Amendment imposes not an "underinclusiveness" limitation but a "content discrimination" limitation upon a State's prohibition of proscribable speech. There is no problem whatever, for example, with a State's prohibiting obscenity (and other forms of proscribable expression) only in certain media or markets, for although that prohibition would be "underinclusive," it would not discriminate on the basis of content.... Another valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associat-

ed with particular secondary effects of the speech, so that the regulation is *justified* without reference to the content of the speech.

*Id.* at 387, 389, 112 S.Ct. 2538 (emphasis in original) (citations and quotations omitted).

The State "may choose to treat adult businesses differently from other businesses...." *Isbell, G and B Emporia, Inc.*, 258 F.3d 1108, 1116 (9th Cir.2001); *see also Young*, 427 U.S. at 70–71, 96 S.Ct. 2440 ("[T]he State may legitimately use the content of these materials as the basis for placing them in a different classification from other motion pictures."). If this is true as a general proposition, then it must also be true as to the specific proposition that a state may single out sexually-oriented businesses to regulate their hours of operation. *See Ben Rich Trading, Inc.*, 126 F.3d at 163 ("[A] municipality may regulate hours of adult businesses differently than other businesses without raising a strong inference of discrimination based on content.").

## IV

In short, we reject Fair Public Policy's argument that we need to assess the regulation in light of how other classes of businesses are treated under Arizona law.[4] The State may choose to treat adult businesses differently from other businesses so long as it does so for the right reasons, and it has done that here. It need do no more.

The judgment of the district court is **AFFIRMED.**

CANBY, Circuit Judge, dissenting:

I dissent from the majority opinion because I conclude that it is inconsistent with *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002). As the majority here recognizes, the focus of our examination of *Alameda Books* is the opinion of Justice Kennedy, because there was no majority opinion and Justice Kennedy's concurring opinion was the one that supported the Court's judgment on the narrowest grounds. *See Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

Like the four dissenters in *Alameda Books*, Justice Kennedy viewed the regulation of adult entertainment businesses to be content-related, because the businesses to be regulated are identified by the content of their speech. *Alameda Books*, 535 U.S. at 448, 122 S.Ct. 1728 (Kennedy, J., concurring). Yet Justice Kennedy agreed with *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), that a regulation that is "designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny." *Alameda Books*, 535 U.S. at 448, 122 S.Ct. 1728.

Justice Kennedy, however, imposed important conditions as part of this intermediate scrutiny. The question in issue in *Alameda Books* was whether the city's ordinance was invalid because the city did not study the secondary effects of the precise use being regulated, but relied on judicially approved precedent from other

---

**4.** Though we reject Fair Public Policy's argument that the statute needs to be assessed in light of how other classes of business are treated, we note in passing that Arizona law does indeed provide for restrictions on the nighttime operation of other classes of business. *See, e.g.,* Ariz.Rev.Stat. § 44–1632 ("A city or town may adopt an ordinance prohib-

iting the operation of pawnshops from 12:00 a.m. to 6:00 a.m."); Ariz.Rev.Stat. § 4–244(15) ("It is unlawful .... to sell, dispose of, deliver or give spiritous liquor to a person between the hours of 1:00 a.m. and 6:00 a.m. on weekdays, and 1:00 a.m. and 10:00 a.m. on Sundays.").

jurisdictions. Justice Kennedy stated that this issue involved two questions:

First, what proposition does a city need to advance in order to sustain a secondary-effects ordinance? Second, how much evidence is required to support the proposition?

*Id.* at 449, 122 S.Ct. 1728. Unlike the plurality opinion, Justice Kennedy focused on the first question, and imposed requirements that are crucial to the present case. He elaborated:

[A] city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact. The ordinance may identify the speech based on content, but only as a shorthand for identifying the secondary effects outside. *A city may not assert that it will reduce secondary effects by reducing speech in the same proportion.*

*Id.* (emphasis added).

Applying this reasoning to the Los Angeles ordinance that prohibited two or more adult entertainment businesses from operating in the same building, Justice Kennedy made his point once again:

It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech.

The analysis requires a few more steps. If two adult businesses are under the same roof, an ordinance requiring them to separate will have one of two results: One business will either move elsewhere or close. *The city's premise cannot be the latter. It is true that cutting adult speech in half would probably reduce secondary effects proportionately. But*

*again, a promised proportional reduction does not suffice .....*

.... The claim, therefore, must be that this ordinance will cause two businesses to split rather than one to close, that the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced.

*Id.* at 450–51, 122 S.Ct. 1728 (emphasis added). Having thus answered his first sub-question, Justice Kennedy then agreed with the plurality with regard to his second: There was sufficient evidence to support the proposition that forced dispersal of two such businesses was reasonably likely to reduce secondary effects at little cost to speech. *Id.* at 452–53, 122 S.Ct. 1728.

The closing-hours statute in issue here, however, proceeds on precisely the theory that Justice Kennedy found insupportable under the First Amendment. The theory is that adult entertainment establishments[1] create adverse secondary effects when they are in operation. If operation is prohibited for several hours each day, the undesirable secondary effects will be reduced accordingly. Unlike a dispersal regulation, the state's instrument is not to move speech, but to stop it. And Justice Kennedy has informed us that "a city may not attack secondary effects indirectly by attacking speech." *Id.* at 450, 122 S.Ct. 1728. A government similarly may not proceed on a theory that "it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449, 122 S.Ct. 1728. It would be hard to find a more exact description than this of Arizona's closing hour regulation of adult entertainment establishments.

1. I use the term "adult entertainment establishments" to refer to expressive activities such as those conducted by the plaintiffs. As the majority opinion points out, the statutory term "sexually-oriented businesses" includes escort services that presumably are not engaged in First Amendment-protected activity. My discussion does not relate to them.

The record in the present case cannot sustain any other theory than the impermissible one. The majority opinion candidly characterizes the pre-enactment support for the statute as "slim." Indeed, it is so slim that I have grave doubts that it suffices under *Renton* without the gloss of *Alameda Books.* I need not address that point, however, because the record clearly fails to support a permissible theory of regulation under Justice Kennedy's test in *Alameda Books.* The evidence in both the legislature and the district court was almost entirely concerned with secondary effects that are unrelated to the hours of occurrence. Studies of the effects of adult entertainment businesses on the crime rate were mentioned in legislative hearings, but none were put into the legislative record. A Minnesota study was said to have reported adverse effects from 24-hour operation of adult establishments, but the study was not produced to the legislature. A study by the city of Phoenix, Arizona, was briefly referred to as having explored the effect of nighttime operation of adult establishments but was said to be "inconclusive"; it also was not produced. Another reference was made to a study by Fulton County, Georgia (also not produced for the legislature), but its conclusions tended to show no disproportionate adverse effect on crime rate because of operation of adult entertainment businesses. *See Flanigan's Enterprises, Inc. v. Fulton County,* 242 F.3d 976, 979 (11th Cir.2001) (describing Fulton County study). The focus of secondary effects in the record was on those effects generally, not on secondary effects caused by late-night operations, and certainly not on *disproportionate* secondary effects of late-night operations. Finally, there is a total absence of evidence anywhere in the record to support the existence of disproportionate secondary effects from operation on Sunday mornings before noon. (Indeed, the required closing on Sunday mornings might suggest to a reasonable observer that something other than the mere regulation of secondary effects was going on in the legislature, but I need not pursue that question here.)

As for the effect of the statute on speech, there is no question that speech is simply stopped during the hours of forced closure. Several affidavits filed in district court asserted that many customers of adult establishments held two jobs and could not patronize the establishments except during hours subject to the closure. Another stated that closure during the targeted hours caused a twenty-five percent decline in gross revenues of an adult establishment. All in all, the record overwhelmingly establishes that the closure, *at best,* achieves a one-for-one elimination of speech and secondary effects—a formula that fails to meet the requirements of the First Amendment as Justice Kennedy has stated them.

The majority opinion here addresses Justice Kennedy's concurrence, but concludes that he did not mean his statements to apply to the present situation. The majority holds that Justice Kennedy meant no change in the *Renton* analysis because he said "the central holding of *Renton* is sound." *Id.* at 448, 122 S.Ct. 1728. But that statement came after Justice Kennedy departed from *Renton*'s assumption that regulation of adult entertainment establishments to limit secondary effects was not content-based. Justice Kennedy stated that this fiction was not useful, and that it was better to admit that such regulations *were* content-based. Such an admission would normally call for review under a strict scrutiny, but Justice Kennedy did not accept that consequence. It is with regard only to the standard of review that he then said: "[T]he central holding of *Renton* is sound: A zoning restriction that is designed to decrease secondary effects and not speech should be

subject to intermediate rather than strict scrutiny." *Id.* To read this statement as a wholesale endorsement of an unmodified *Renton* analysis is to ignore context.[2]

The majority opinion also refers to Justice Kennedy's statement that he feared the plurality opinion's "application of *Renton* might constitute a subtle expansion, with which I do not concur." *Id.* at 445, 122 S.Ct. 1728. Here again, it over-reads Justice Kennedy's statement to accept it as an endorsement of *Renton* without the gloss Justice Kennedy adds to the analysis in his opinion. If Justice Kennedy thought that the *Renton* analysis was correct, except for its denomination of the ordinance as content-neutral, he could have stated that minor disagreement and joined all the rest of the plurality opinion. His major reason for writing was to establish that the plurality's analysis was deficient because it did "not address how speech will fare under the city's ordinance." *Id.* at 450, 122 S.Ct. 1728. He then spends nearly all of the remainder of his opinion explaining his rule that a government cannot reduce secondary effects by reducing speech on a one-for-one basis. That is what Arizona has done here. I would take Justice Kennedy at his word and on this record would hold Arizona's statute to be in violation of the First Amendment.

---

**2.** The majority opinion quotes the Tenth Circuit opinion in *Z.J. Gifts D–4, L.L.C. v. City of Littleton*, 311 F.3d 1220, 1239 n. 15 (10th Cir.2002), for the proposition that " 'nothing in ... *Alameda Books* requires reconsideration' of the traditional *Renton* framework." The Tenth Circuit's statement, however, was that "nothing in ... *Alameda Books* requires reconsideration of our conclusion as to the applicable standard of review." *Id.* The

Tenth Circuit was merely in agreement with Justice Kennedy that intermediate review was appropriate, not strict scrutiny as Z.J. Gifts was arguing. The Tenth Circuit said nothing about leaving the *Renton* "framework" intact.

Nor is the Seventh Circuit's description of Justice Kennedy's opinion, *see Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 721 (7th Cir.2003), inconsistent with my reading of it.