NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0655n.06

No. 09-3920

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| 84 VIDEO/NEWSSTAND, INC., dba 84 Video/Newsstand; VINE STREET NEWS, INC., dba Adult Mart; NU PHILLY VIDEO/NEWS, INC.; MILE, INC., dba Lion's Den; AMERICAN PRIDE, INC., dba Lion's Den; MIDWEST PRIDE II, INC., dba Lion's Den; ENTERTAINMENT U.S.A. OF CLEVELAND, INC., dba Christie's Cabaret; GOLD RESTAURANT, INC., dba Gold Horse; DONNA AND BATO, LLC, dba Expressions; CALPAL, LLC, dba Dreamgirls; NL CORP INC., dba Diamonds Cabaret; BUCKEYE ASSOCIATION OF CLUB EXECUTIVES, INC., <br><br> Plaintiffs - Appellants, <br><br> v. <br><br> THOMAS SARTINI, in his official capacity as Ashtabula County Prosecutor; ROSS CIRINCIONE, in his official capacity as Law Director of the City of Bedford Heights; DAVID A. LAMBROS, in his official capacity as Law Director of the City of Brookpark; ROBERT TRIOZZI, in his official capacity as Law Director of the City of Cleveland; WILLIAM MASON, in his official capacity as Cuyahoga County Prosecutor; TONY GEIGER, in his official capacity as Law Director for the City of Lima; JEURGEN WALDICK, in his official capacity as Allen County Prosecutor; MIKE MINNIEAR, in his official capacity as Law Director for the City of Milford; ROBIN PIPER, in his official capacity as Butler County Prosecutor; MATTHEW E. CRALL, in his official capacity as Law Director of the City of Bucyrus; STANLEY E. FLEGM, in his official capacity as | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |

Crawford County Prosecutor; DAVID KIGER, in his official capacity as Law Director of the City of Jeffersonville; DAVID B. BENDER, in his official capacity as Fayette County Prosecutor; RICHARD C. PFEIFFER, JR., in his official capacity as Columbus City Attorney; RON O'BRIEN, in his official capacity as Franklin County Prosecutor; DONNETTE FISHER, in his official capacity as Law Director for the City of Franklin; RACHEL A. HUTZEL, in his official capacity as Warren County Prosecutor; DANIEL G. PADDEN, in his official capacity as Guernsey County Prosecutor; DAVID A. HACKENBERG, in his official capacity as Law Director of the City of Findlay; MARK C. MILLER, in his official capacity as Hancock County Prosecutor; JOSEPH T. DETERS, in his official capacity as Hamilton County Prosecutor; JOSEPH R. KLAMMER, in his official capacity as Law Director of the City of Eastlake; CHARLES E. COULSON, in his official capacity as Lake County Prosecutor; RICHARD S. BINDLEY, in his official capacity as Law Director of the City of Heath; DOUGLAS SASSEN, in his official capacity as Law Director for the City of Newark; KENNETH W. OSWALT, in his official capacity as Licking County Prosecutor; JOHN T. MADIGAN, in his official capacity as Law Director of theCity of Toledo; PAUL S. GOLDBERG, in his official capacity as Law Director for the City of Oregon; JULIA R. BATES, in her official capacity as Lucas County Prosecutor; IRIS TORRES GUGLUCELLO, in her official capacity as Law Director of the City of Youngstown; PAUL J. GAINS, in his official capacity as Mahoning County Prosecutor; KENNETH FISHER, in his official capacity as Law Director of the City of Brunswick; DEAN HOLMAN, in his official capacity as Medina County Prosecutor; PATRICK BONFIELD, in his official capacity as Law Director of the City of Dayton; LORI E. KIRKWOOD, in her official capacity as Law Director for the City of West Carrollton; MATHEW HECK, in his official capacity as Montgomery County Prosecutor; CHARLES HOWLAND, in his official capacity as Morrow County Prosecutor; DAVE REMY, in his official capacity as Law Director for the City of Mansfield; JAMES MAYER, in his official capacity as Richland County Prosecutor; TONI EDDY, in his official capacity as Law Director of the City of Chillicothe; MICHAEL M. ATER, in his official capacity as Ross County Prosecutor; ANDREW L. ZUMBAR, in his official capacity as Law Director of the City of Alliance; JOSEPH MARTUCCIO, in his official capacity as Law Director of the City of Canton; JOHN FERRERO, in his official capacity as Stark County Prosecutor; MAX ROTHAL, in his official capacity as Law Director for the City of Akron; PENELOPE TAYLOR, in her official capacity as Law Director for the City of Tallmadge; SHERRI BEVAN WALSH, in her official capacity as Summit County Prosecutor; JOSEPH T. DULL, in his official capacity as Law Director for the City of Niles; DENNIS WATKINS, in his official capacity as Trumbull County Prosecutor; MIKE JOHNSON, in his official capacity as Law Director for the City of New Philadelphia; AMANDA K. SPIES, in her official capacity as Tuscarawas County Prosecutor; RUSS LEFFLER, in his official capacity as Huron County Prosecutor; DEREK DIVEINE, in his official capacity as Seneca County Prosecutor; TERRY S. SHILLING, in his official capacity  as Law Director for the City of Elyria; DENNIS WILL, in his official capacity as Lorain County Prosecutor; MARTIN FRANTZ, in his official capacity as Wayne County Prosecutor; SCOTT HILLIS, in his official capacity as Law Director for the City of Zanesville; D. MICHAEL HADDOX, in his official capacity as Muskingum County Prosecutor; STEPHEN A. SCHUMAKER, in his official capacity as Clark County Prosecutor; NEAL M. JAMISON; PETER M. KOSTOFF, Law Director,

        Defendants - Appellees,

2

THE STATE OF OHIO,

           Defendant - Intervenor

**Before: KETHLEDGE and WHITE, Circuit Judges; and BECKWITH[*], Senior District Judge.**

      **HELENE N. WHITE, Circuit Judge.** Plaintiffs 84 Video/Newsstand, Inc. et al. (Plaintiffs) appeal the district court's grant of summary judgment to Defendants Thomas Sartini, et al. (Defendants), law directors and county prosecutors for cities, villages, and counties throughout Ohio, and Defendant-Intervenor State of Ohio, in this action challenging certain regulations of sexually oriented businesses in Ohio as violative of the First Amendment. We **AFFIRM.**

**I**

      On May 16, 2007, the Ohio General Assembly adopted Substitute Senate Bill 16 ("S.B. 16"), codified at Ohio Rev. Code Ann. § 2907.40 (West 2010) ("the Law" or "§ 2907.40"), to regulate the operation of sexually oriented businesses. Section 2907.40 imposes two substantive restrictions on sexually oriented businesses. First, § 2907.40(B) limits hours of operation:

> No sexually oriented business shall be or remain open for business between 12:00 midnight and 6:00 a.m. on any day, except that a sexually oriented business that holds a liquor permit . . . may remain open until the hour specified in that permit if it does not conduct, offer, or allow sexually oriented entertainment activity in which the performers appear nude.

---

     [*]Judge Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

3

Ohio Rev. Code Ann. § 2907.40(B).[1]  Second, § 2907.40(C) adopts a so-called "no-touch" provision,

limiting physical contact with and between nude or semi-nude performers:

> (1) No patron who is not a member of the employee's immediate family shall knowingly touch any employee while that employee is nude or seminude or touch the clothing of any employee while that employee is nude or seminude.

> (2) No employee who regularly appears nude or seminude on the premises of a sexually oriented business, while on the premises of that sexually oriented business and while nude or seminude, shall knowingly touch a patron . . .or another employee . . . or the clothing of a patron . . . or another employee . . . or allow a patron . . . or another employee . . . to touch the employee or the clothing of the employee.

*Id.* § 2907.40(C) (ellipses in subsection (C)(2) refer to exceptions for members of employee's

immediate family).  Violation of § 2907.40(B) is a first-degree misdemeanor.  *Id.* § 2907.40(D).

Violation of § 2907.40(C) is a first-degree misdemeanor if the violation is achieved by touching a

"specified anatomical area"[2] or clothing covering such area, and is a fourth-degree misdemeanor if

achieved by touching any other part of the body.  *Id.* § 2907.40(E).

> Subsection (A) of the Law defines relevant terms, including "sexually oriented business":

> an adult bookstore, adult video store, adult cabaret, adult motion picture theater, sexual device shop, or sexual encounter center, but does not include a business solely by reason of its showing, selling, or renting materials that may depict sex.

*Id.* § 2907.40(A)(15).  Each individual type of sexually oriented business is also defined.  In

particular, "adult bookstore" or "adult video store"

---

[1]Businesses that hold liquor permits in Ohio are required to close at 2:30 A.M.  Therefore, a sexually oriented business with a liquor license may remain open until 2:30 only if all nude performances cease at midnight.

[2]Section 2907.40(A)(16) defines "specified anatomical areas" as "human genitals, pubic region, and buttocks and the human female breast below a point immediately above the top of the areola."

means a commercial establishment that has as a significant or substantial portion of its stock in trade or inventory in, derives a significant or substantial portion of its revenues from, devotes a significant or substantial portion of its interior business or advertising to, or maintains a substantial section of its sales or display space for the sale or rental, for any form of consideration, of books, magazines, periodicals, or other printed matter, or photographs, films, motion pictures, video cassettes, compact discs, slides, or other visual representations, that are characterized by their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas.[3]

*Id.* § 2907.40(A)(1). Section 2907.40(A)(2) originally provided its own definition of "adult cabaret."

It was later amended to replace the original definition with a reference to the definition contained

in § 2907.39. That section provides:

"Adult cabaret" means a nightclub, bar, juice bar, restaurant, bottle club, or similar commercial establishment, whether or not alcoholic beverages are served, that regularly features any of the following:

(a) Persons who appear in a state of nudity or seminudity;

(b) Live performances that are characterized by the exposure of specified anatomical areas or specified sexual activities;

(c) Films, motion pictures, video cassettes, slides, or other photographic reproductions that are distinguished or characterized by their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas.

*Id.* § 2907.39(A)(3).

The stated purpose of S.B. 16 was to address the adverse secondary effects of sexually

oriented businesses. The bill included legislative findings that:

[s]exually oriented businesses, as a category of commercial uses, are associated with a wide variety of adverse secondary effects including, but not limited to lewdness, public indecency, prostitution, potential spread of disease, illicit drug use and drug

---

[3]"Characterized by" is defined as "describing the essential character or quality of an item." Ohio Rev. Code Ann. § 2907.40(A)(4).

trafficking, personal and property crimes, negative impacts on surrounding properties, blight, litter, and sexual assault and exploitation.

S.B. 16, 127th Gen. Assem., Reg. Sess. (Ohio 2007), § 3768.03(B)(1).[4] Prior to passage of S.B. 16, the House Judiciary Committee of the Ohio General Assembly heard testimony for and against the bill and received considerable documentary evidence regarding the secondary effects of sexually oriented businesses. The Senate State and Local Government and Veterans Affairs Committee also considered the legislation. The Ohio General Assembly relied on a variety of sources, including: presentations providing anecdotal accounts of the adverse secondary effects of sexually oriented businesses; summaries and full texts of studies and reports showing that adult businesses cause secondary effects; a critique of the study of one researcher who concluded that adult businesses do not cause adverse secondary effects; legal opinions from the Sixth Circuit and elsewhere upholding regulations addressing secondary effects of adult businesses; and other testimony in favor of the bill. The Legislature also heard testimony from opponents.

On October 17, 2007, the day § 2907.40 went into effect, the twelve Plaintiffs filed suit seeking a temporary restraining order (TRO), preliminary injunction, permanent injunction, and declaratory judgment. The district court described the parties to the suit:

> Plaintiffs consist of three groups: (1) businesses throughout Ohio that sell adult books, magazines, videos, and DVDs ("bookstore Plaintiffs"); (2) businesses throughout Ohio that present nude or seminude adult performances to patrons ("cabaret Plaintiffs"); and (3) the Buckeye Association of Club Executives ("BACE"), a not-for-profit trade group that promotes and protects the rights of member adult bookstores and cabarets throughout Ohio.

---

[4]These findings were included in the version of S.B. 16 initially passed by the Ohio General Assembly. The final legislation enacted by the Assembly that included the current language of § 2907.40 was a substitute bill. The above legislative findings do not appear in the version of Substitute S.B. 16 enacted into law.

6

Defendants consist of two groups: (1) law directors for cities and villages throughout Ohio in which Plaintiffs and BACE members are located; and (2) county prosecutors for the counties throughout Ohio in which Plaintiffs and BACE members are located. Defendants have the authority to prosecute violations of § 2907.40. Plaintiffs also served the Ohio Attorney General, pursuant to Federal Rule of Civil Procedure 5.1, because the case involves a question of Ohio constitutional law.

The State of Ohio intervened as a defendant on October 26, 2007.

The district court denied the motion for a TRO on October 18. The court then held a preliminary injunction hearing. At the hearing, Plaintiffs called five witnesses, including two experts: Dr. Daniel Linz, an expert on secondary-effects studies, who testified that sexually oriented businesses do not cause appreciable secondary effects and critiqued existing studies showing secondary effects; and Dr. Judith Hanna, an expert on exotic dance, who testified regarding the expressive aspects of exotic dance. Plaintiffs also offered testimony from individuals with experience operating sexually oriented businesses and submitted the declaration of Dr. Lance Freeman, in which he summarized the findings of a study concluding that the presence of an adult bookstore or adult cabaret in proximity to residential property did not depress property values.

Defendants called three witnesses who testified that sexually oriented businesses cause secondary effects, including crime: Julie Taylor Schmatz, a former exotic dancer; Louis Gentile, a private investigator; and Dr. Richard McCleary, an expert on secondary-effects studies.

The court denied Plaintiffs' motion for a preliminary injunction on August 8, 2008.[5]

---

[5]Plaintiffs appealed the denial of a preliminary injunction to this court. While the appeal was pending, the district court granted summary judgment for Defendants and entered final judgment on all claims, and Plaintiffs filed the instant appeal. This court subsequently dismissed the preliminary injunction appeal on the ground of mootness and because "[t]he denial of injunctive relief has merged into the final judgment." *84 Video/Newsstand, Inc. v. Sartini*, No. 08-4559 (6th Cir. filed Nov. 4, 2009).

While the district court proceedings were ongoing, the Ohio General Assembly amended the definition of "adult cabaret" contained in § 2907.40(A)(2), replacing the original definition with a provision incorporating by reference the definition of "adult cabaret" found in § 2907.39 of the Revised Code. Sub. S.B. No. 183, 2008 Ohio Laws 101. Plaintiffs moved for a TRO or preliminary injunction to bar implementation of this amendment. The court denied that motion in an order dated January 5, 2009. Defendants then moved for summary judgment on all Plaintiffs' claims, which the court granted on June 22, 2009. Plaintiffs timely appealed.

## II

This court reviews a district court's grant of summary judgment *de novo*. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Binay*, 601 F.3d at 646. This court must draw all reasonable inferences and view all evidence in favor of the non-moving party. *Binay*, 601 F.3d at 646; *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 792 (6th Cir. 2009).

Plaintiffs raise a number of issues on appeal, arguing that: S.B. 16 was based on insufficient evidence that sexually oriented businesses cause certain secondary effects and is not narrowly tailored; the law's definitions of "adult bookstore or video store" and "adult cabaret" are unconstitutionally overbroad; the no-touching restriction independently violates the First Amendment; and adult bookstores and adult video stores are actually excluded from regulation by the plain language of the law. We address these arguments in order.

## III

Plaintiffs first assert that Ohio Rev. Code Ann. § 2907.40 violates the First Amendment because the evidence relied on by the Ohio General Assembly in passing the statute was insufficient to survive intermediate scrutiny. They further argue that the law is not narrowly tailored because it suppresses a substantial amount of speech.

## A. Applicable Law

It is beyond doubt that "[n]ude dancing is a form of expressive conduct protected by the First Amendment." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 298 (6th Cir. 2008); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 391 (6th Cir. 2001); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality opinion) ("Nude dancing . . . is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection."). Other forms of erotic entertainment are similarly protected by the First Amendment. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46-47 (1986) (affirming that adult theaters are protected by the First Amendment); *Richland Bookmart, Inc. v. Knox Cnty.* (*Richland Bookmart II*), 555 F.3d 512, 520 (6th Cir. 2009) ("[S]exually explicit but non-obscene speech, such as adult publications and adult videos" are within a "protected category of speech").

We treat regulations targeting the "secondary effects" of sexually oriented businesses as content-neutral, and assess them under intermediate scrutiny.[6] *Richland Bookmart II*, 555 F.3d at 521 & n.2; *729, Inc. v. Kenton Cnty. Fiscal Court*, 515 F.3d 485, 490-91 (6th Cir. 2008). Where a

---

[6]As this court has noted, "to some extent, the classification of restrictions on sexually explicit establishments as content-neutral is a legal fiction — but one that has been generally followed." *Richland Bookmart II*, 555 F.3d at 521 n.2. "Although five members of the Court abandoned the premise that such restrictions are content-neutral . . . in *City of Los Angeles v. Alameda Books*, [535 U.S. 425 (2002),] the Court continued to apply intermediate scrutiny to laws targeting 'secondary effects.' " *Id.* (quoting *729, Inc.*, 515 F.3d at 490-91).

law specifically targets the secondary effects of adult businesses, this court applies the test set out in *United States v. O'Brien*, 391 U.S. 367 (1968), as interpreted by *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), and *City of Los Angeles v. Alameda Books, Inc*, 535 U.S. 425 (2002). *Richland Bookmart II*, 555 F.3d at 523-24 ("[W]e find it prudent to conduct our analysis in terms set forth in *Renton* and *Alameda Books*–or, equivalently, to apply the *O'Brien* test, incorporating evidentiary standards articulated in *Renton* and its progeny.").

Under the *O'Brien* test, courts must determine whether the legislature enacted a challenged law "(1) within its constitutional power, (2) to further a substantial governmental interest that is (3) unrelated to the suppression of speech, and whether (4) the provisions pose only an 'incidental burden on First Amendment freedoms that is no greater than is essential to further the government interest.'" *Sensations*, 526 F.3d at 298. On the second prong of the *O'Brien* test, this Circuit further applies the plurality opinion in *Alameda Books*, which announced a three-step burden-shifting analysis applicable to secondary-effects cases. *Richland Bookmart II*, 555 F.3d at 525. Under *Alameda Books*,

> [first,] a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest. This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance. [Second, if] plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*. [Third, if] plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

535 U.S. at 438-39 (plurality opinion) (citations omitted); *see also Sensations*, 526 F.3d at 297 n.5. Further, the legislature's evidentiary burden is slight:

10

[W]e have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required. As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners. . . . [The government] is entitled to rely on [its local] knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion.

535 U.S. at 451-52 (Kennedy, J., concurring) (citations omitted). Indeed, state and local governments "need not conduct their own studies demonstrating that adverse secondary effects result from the operation of sexually oriented businesses or that the measures chosen will ameliorate these effects." *Richland Bookmart II*, 555 F.3d at 524; *see also Alameda Books*, 535 U.S. at 438 (plurality opinion); *id.* at 451 (Kennedy, J., concurring); *Renton*, 475 U.S. at 51-52. However, "a city may not attack secondary effects indirectly by attacking speech." *Alameda Books*, 535 U.S. at 450 (Kennedy, J., concurring). The regulation must be aimed at secondary effects, and the government "must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." *Id.* at 449.

**B. Section 2907.40 Survives Scrutiny Under the *O'Brien* Test**

1. Passage of § 2907.40 Was Within the Power of the Ohio General Assembly

The first question under the *O'Brien* test is whether enacting § 2907.40 was within the state's constitutional power. The parties do not dispute that the Ohio General Assembly had such power. This court has held that "regulating sexually oriented businesses to reduce negative secondary effects lies within the scope of a [government's] authority under the *O'Brien* test." *Sensations*, 526 F.3d at 298. Therefore, the first prong of the *O'Brien* test is satisfied.

2. Section 2907.40 Furthers a Substantial Government Interest

11

The second step of the *O'Brien* test asks whether the legislature enacted the law "to further a substantial government interest." *See Sensations*, 526 F.3d at 298. Under the *Alameda Books* burden-shifting framework, Defendants must first show that the Ohio General Assembly relied on "evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest." 535 U.S. at 438 (plurality opinion). "It is now recognized that governments have a substantial interest in controlling adverse secondary effects of sexually oriented establishments, which include violent, sexual, and property crimes as well as blight and negative effects on property values." *Richland Bookmart II*, 555 F.3d at 524. Thus, our inquiry hinges on the evidence the Ohio General Assembly relied on when it passed § 2907.40. This court has held that a wide variety of sources may form a sufficient evidentiary basis at this stage, including land-use studies, prior judicial opinions, surveys of relevant professionals (such as real-estate appraisers), anecdotal testimony, police reports, and other direct and circumstantial evidence. *See, e.g.*, *Richland Bookmart II*, 555 F.3d at 525; *729, Inc.*, 515 F.3d at 491-92; *J.L. Spoons, Inc. v. Dragani*, 538 F.3d 379, 381 (6th Cir. 2008); *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 296 (2000) (noting that the City of Erie was permitted to rely on prior judicial decisions and that "it was reasonable for Erie to conclude that . . . nude dancing was likely to produce the same secondary effects" found in the prior decisions).

In the instant case, the Ohio General Assembly gathered a range of evidence demonstrating that sexually oriented businesses cause harmful secondary effects, including a combination of anecdotal evidence from live testimony and other submissions, press reports, land-use studies, expert reports, and prior judicial opinions. The evidence consists both of studies and cases from other jurisdictions, and of studies, cases, press reports, and anecdotal evidence from Ohio. This evidence

12

is sufficient to demonstrate a reasonable belief on behalf of the General Assembly that sexually oriented businesses cause negative secondary effects, including certain types of crime, decreased property values, and health risks, and that the proposed statute would address such effects. The burden thus shifts to Plaintiffs to show either that the evidence does not fairly support the General Assembly's rationale for the law — to combat secondary effects — or that the factual findings relied on by the General Assembly were incorrect. *Alameda Books*, 535 U.S. at 438-39.

The Sixth Circuit has previously upheld regulations similar or identical to those enacted in § 2907.40. *See Richland Bookmart II*, 555 F.3d at 519 (upholding, without discussion, an hours-of-operation restriction); *Entm't Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 393-94 (6th Cir. 2009) (upholding, against overbreadth challenge, a no-touching and six-foot buffer-zone requirement between entertainers and customers and between entertainers and other entertainers); *Sensations*, 526 F.3d at 299 (upholding no-touching rule between performers and audience members and hours-of-operation restriction); *729, Inc*, 515 F.3d at 490-93 (upholding requirement that entertainers must "maintain a minimum distance of five . . . feet from . . . customers, for a minimum of one . . . hour after the entertainer appears semi-nude on the establishment's premises"); *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 789-91 (6th Cir. 2005) (en banc) (upholding an hours-of-operation limitation); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 396 (6th Cir. 2001) (upholding regulation prohibiting physical contact between customers and entertainers); *Richland Bookmart, Inc. v. Nichols* (*Richland Bookmart I*), 137 F.3d 435, 440-41 (6th Cir. 1998) (upholding hours-of-operation restriction); *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403, 408-13 (6th Cir. 1997) (upholding a regulation prohibiting "entertainers

13

from approaching within six feet of customers, employees, or other entertainers during a performance").

Nonetheless, Plaintiffs make two main attacks on the evidence underlying § 2907.40. First, they argue that testimony by their own expert, Dr. Daniel Linz, casts sufficient doubt on the secondary-effects studies relied on by the General Assembly to create a genuine issue of material fact requiring a trial. Second, Plaintiffs argue that the General Assembly's evidence of secondary effects does not support the hours-of-operation restriction in § 2907.40(B).

      i. Plaintiffs' Expert Fails to Cast Doubt on the Evidence Relied on by the Ohio General Assembly

Plaintiffs argue that studies and analyses conducted by Dr. Linz substantially undermine the evidence relied on by the General Assembly  At the preliminary injunction hearing, Linz testified regarding studies he conducted in cities around the country and in Toledo, Cleveland, Columbus, and Dayton, Ohio. He concluded in all these studies that sexually oriented businesses do not increase adverse secondary effects, namely crime, in surrounding areas. He also testified, as to studies conducted by other researchers, that "the methods are either so flawed or the studies so poorly conducted, that they do not, in fact, demonstrate an adverse secondary effect." Plaintiffs additionally submitted a declaration from Dr. Lance Freeman, accompanied by a study of property values in Ohio he co-authored, concluding that "the presence of an adult bookstore or adult cabaret in proximity to residential property did not lead to a decrease in property values."

Defendants offered testimony by Dr. McCleary. McCleary discussed secondary-effects studies he conducted, and explained that "in every instance, [he] ha[s] been able to corroborate the theory" that sexually oriented businesses cause secondary effects. Based on his own and other

14

researchers' studies, he testified that "it is a scientific fact that sexually-oriented businesses have crime-related secondary effect [sic], that they pose public safety hazards to their immediate environments." McCleary also directly criticized the validity of the findings of Linz's study of four Ohio cities, arguing that the underlying data did in fact demonstrate secondary effects. Linz and McCleary primarily disagreed about study methodology, including: the appropriate criteria for judging the validity of secondary-effects studies; the best way to measure the incidence of crime; the proper geographic area surrounding a sexually oriented business within which to measure crime; and the period of time a study must analyze in order to be valid.

The evidence proffered by Plaintiffs — testimony and reports of qualified experts — is indeed the type of evidence that may appropriately be used to cast doubt on the Legislature's evidence. *See Richland Bookmart II*, 555 F.3d at 526 (commenting that plaintiffs' evidence "is of dubious substantive import" because, "[u]nlike most plaintiffs challenging similar regulations, Plaintiffs do not introduce their own expert findings or studies" (citation omitted)); *J.L. Spoons*, 538 F.3d at 381-82 (describing expert testimony offered by plaintiffs at preliminary injunction hearing). The question, then, is whether the testimony of Drs. Linz and Freeman is sufficient to create a genuine issue of material fact as to the accuracy of the evidence relied on by the Legislature.

This court has repeatedly held that governments are not "required to demonstrate empirically that [their] proposed regulations will or are likely to successfully ameliorate adverse secondary effects." *Richland Bookmart II*, 555 F.3d at 524. "[E]vidence suggesting that a different conclusion [by the legislature] is also reasonable does not prove that the [government's] findings were impermissible or its rationale unsustainable." *Id.* at 527. Under *Alameda Books*, the touchstone is whether the legislature "reasonably believed [the evidence it relied on] to be reasonable" and

15

whether the evidence "fairly support[s] the [legislature's] rationale" for the law. 535 U.S. at 438. A mere difference of opinion about the conclusions to be drawn from a body of evidence cannot invalidate the legislature's decision.

This court has twice decided secondary-effects cases where Dr. Linz's testimony or reports were discussed on appeal. *Sensations*, 526 F.3d at 295 (upholding Grand Rapids, Michigan, ordinance regulating sexually oriented businesses); *J.L. Spoons*, 538 F.3d at 382-83 (upholding Ohio Liquor Commission Rule restricting nude dancing and sexual contact at establishments holding Liquor Control Commission permits). But neither of these cases gave more than cursory mention to Linz's testimony, and neither specifically discussed whether or to what extent Linz's evidence cast doubt on the evidence relied on by the legislature. Secondary effects cases in other circuits where Linz's testimony was introduced have split regarding the weight to be afforded that evidence. A majority of decisions have held that testimony and studies by Linz were insufficient to invalidate the legislative body's evidence. *See, e.g.*, *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 747-48 (4th Cir. 2010); *Doctor John's v. Wahlen*, 542 F.3d 787, 791-93 (10th Cir. 2008); *Fantasyland Video, Inc. v. Cnty. of San Diego*, 505 F.3d 996, 1002 (9th Cir. 2007); *G.M. Enters., Inc. v. Town of St. Joseph*, 350 F.3d 631, 635-36, 640 (7th Cir. 2003); *see also Galardi v. City of Forest Park*, No. 1:09-CV-965-RWS, 2011 WL 111586, at *6 (N.D. Ga. Jan. 13, 2011).

Plaintiffs rely mainly on two recent Seventh and Tenth Circuit cases that credited Linz's testimony with casting doubt on the evidence supporting the government regulations. *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 461-65 (7th Cir. 2009) (concluding that a showing that the city's evidence was not germane to the restrictions it enacted *in combination with* the presentation of a study by Linz raised a genuine issue of material fact and required remand for an

16

evidentiary hearing); *Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty.*, 492 F.3d 1164, 1187 (10th Cir. 2007) (Ebel., J., concurring; concurrence joined by full panel as alternative ground of decision) (crediting Dr. Linz's studies and testimony with undermining the county's evidence, both by presenting five studies conducted by Linz that found no adverse secondary effects from sexually oriented businesses, and by offering testimony and a peer-reviewed article "challenging the validity of the County's studies").

In this case, Linz's evidence is of two types: studies Linz conducted finding that sexually oriented businesses do not cause adverse secondary effects, and criticism of the validity of studies by other researchers that do find such effects. Linz's study of four Ohio cities is directly relevant to the central issue in this case and, if accurate, does tend to cast doubt on the Ohio General Assembly's evidence. McCleary's testimony, in turn, casts doubt on Linz's study.

We conclude that the Linz evidence in the record before us is insufficient to create a genuine issue of material fact requiring remand. This is for two reasons. First, Linz's testimony and studies fail to cast doubt on the entire body of evidence relied on by the General Assembly, including those secondary-effects studies not discussed by Linz and the significant quantity of other types of evidence relied on by the Legislature with which Linz does not engage, including prior court decisions, news reports, and anecdotal testimony by law enforcement officials and others. The legislature's evidentiary burden to justify a regulation targeted at secondary effects is slight. Here, Plaintiffs' testimony and exhibits do not show the body of that evidence as a whole to be so questionable as to undermine support for the restrictions in § 2907.40. Second, to the extent that the Linz evidence does "dispute[] the [government's] factual findings" at step two of the *Alameda Books* burden shifting test, 535 U.S. at 438-39, the testimony and reports by Dr. McCleary introduced at

17

the preliminary injunction hearing were sufficient "to supplement the record with evidence renewing support for a theory that justifies" the Ohio law in satisfaction of *Alameda Books* step three. *Id.* at 439. The Linz and McCleary testimony amounts to a battle of experts who primarily disagree about study methodology. The General Assembly had before it studies by McCleary as well as a paper by McCleary critiquing Linz's methodology. The General Assembly was entitled to credit McCleary's findings as providing reasonable support for the restrictions it enacted. Even assuming that Linz's evidence, by itself, casts doubt on the Legislature's evidence, McCleary's testimony renews support for Ohio's theory of secondary effects. Thus, no genuine issue of material fact remains as to whether the Legislature properly relied on the secondary-effects evidence before it.

ii. Whether the Ohio General Assembly's Evidence was Sufficient to Support the Hours-of-Operation Restriction in § 2907.40(B)

Plaintiffs also argue that the General Assembly's evidence of secondary effects does not support the hours-of-operation restriction in § 2907.40(B). This court has upheld restrictions on the hours of operations of sexually oriented businesses in several cases. *See Richland Bookmart II*, 555 F.3d at 519 (upholding, but not discussing, an hours-of-operation restriction); *Sensations*, 526 F.3d at 294, 299 (upholding prohibition against sexually oriented businesses operating between 2:00 AM and 7:00 AM); *Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 789-91 (6th Cir. 2005) (en banc) (upholding regulation requiring sexually oriented businesses to close at midnight); *Richland Bookmart, Inc. v. Nichols* (*Richland Bookmart I*), 137 F.3d 435, 438, 440-41 (6th Cir. 1998) (upholding requirement that sexually oriented businesses close between midnight and 8:00 AM Monday through Saturday and all day on Sunday). Those cases gave significant deference to legislative bodies, finding that "'[r]educing crime, open sex and solicitation of sex and preserving

18

the aesthetic and commercial character of the neighborhoods surrounding adult establishments is a substantial government interest . . . . It is not unreasonable to believe that such regulation of hours [of operation] . . . would tend to deter prostitution' and other negative secondary effects." *Deja Vu of Cincinnati*, 411 F.3d at 790 (quoting *Richland Bookmart I*, 137 F.3d at 440) (alterations in original).

In this case, the General Assembly considered evidence specifically relevant to the conclusion that closing sexually oriented businesses during the early morning hours could ameliorate negative secondary effects, including prior court cases upholding such restrictions and testimony at the legislative committee hearing by a police officer with experience investigating crime at sexually oriented businesses and by a former manager of adult-entertainment establishments.[7] To rebut these legislative findings, Dr. Linz testified in district court that one of his own studies had found no support for the theory that sexually oriented businesses attract more crime during the late-night or early-morning hours than at other times. Dr. McCleary, in turn, testified that, although he knows of no studies correlating the severity of secondary effects of adult businesses to their hours of operation, there has been a significant amount of research supporting the more general proposition that "[c]rime risks for any business that's at risk goes up" at night.

Most of the evidence before the General Assembly that supports an hours-of-operation restriction discussed the late-night secondary effects of live-entertainment establishments, not adult

---

[7]Captain Chuck Adams of the Troy Police Department testified that most illegal activity at a strip club he had investigated occurred after midnight. That activity included open alcoholic containers in a public place, drug possession, DUIs, assault, and prostitution. David Sherman, a former regional manager of a strip-club chain, described how the incidence of illegal activity at strip clubs, including "drug dealing, solicitation, and illegal dances," increased late at night as employees and customers became more intoxicated and disinhibited.

bookstores and adult video stores. Nonetheless, proponents of S.B. 16 presented the General Assembly with several decisions by courts of appeals upholding such restrictions as applied to adult bookstores and video stores, including *Center for Fair Public Policy v. Maricopa County*, 336 F.3d 1153 (9th Cir. 2003), from the Ninth Circuit and *Richland Bookmart I* from this circuit. *Center for Fair Public Policy*, in particular, provides support for the restriction, as it canvassed evidence, including testimony and studies from other jurisdictions, that indicated a link between secondary effects and the hours of operation of non-live-entertainment adult businesses. Additionally, this circuit's opinion in *Sensations, Inc.* upheld a municipal ordinance limiting the hours of operation of all sexually oriented businesses, including book stores and video stores. 526 F.3d at 294, 298-99. The Ohio General Assembly relied on sufficient evidence to support passage of the law.

### 3. § 2097.40 is Unrelated to the Suppression of Speech

The third prong of the *O'Brien* test requires this court to determine whether the challenged law is in fact "unrelated to the suppression of speech." *Sensations*, 526 F.3d at 298. The parties do not argue that it is not. Targeting the secondary effects of sexually oriented businesses is permissible under *O'Brien*. *See, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 585-86 (1991) (Souter, J., concurring) ("[O]n its face, the governmental interest in combating prostitution and other criminal activity is not at all inherently related to expression."). Because the stated and unchallenged purpose of § 2907.40 is to address such secondary effects, the law survives *O'Brien*'s third prong.

### 4. § 2907.40 Poses Only an Incidental Burden on First Amendment Freedoms that is No Greater than is Essential to Further the Government Interest

The fourth prong of the *O'Brien* test asks whether the restrictions "pose only an 'incidental burden on First Amendment freedoms that is no greater than is essential to further the government

interest.'" *Sensations*, 526 F.3d at 298. Justice Kennedy's concurrence in *Alameda Books* sharpens this inquiry, requiring that a government "must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." 535 U.S. at 449 (Kennedy, J., concurring). In other words, "the necessary rationale for applying intermediate scrutiny is the promise that [regulations] may reduce the costs of secondary effects without substantially reducing speech." *Id.* at 450. Justice Kennedy's concurrence thus requires a proportionality analysis: a government may not seek to reduce secondary effects by reducing speech on a one-to-one basis. As he put it, "[i]t is true that cutting adult speech in half would probably reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice. Content-based taxes could achieve that, yet these are impermissible." *Id.* at 451. This court has held that Kennedy's discussion on this point is binding. *729, Inc.*, 515 F.3d at 491 ("Although the *Alameda Books* plurality did not discuss [this] requirement, Justice Kennedy expressly said that consideration of this issue was required for his concurrence in the judgment. Justice Kennedy's opinion binds us on this point.").

Plaintiffs assert that the hours-of-operation restriction fails under this proportionality analysis because it directly reduces a substantial amount of speech. We disagree. Plaintiffs' argument proceeds in two steps: First, they posit that there is insufficient evidence that closing sexually oriented businesses between midnight and 6:00 AM would significantly curtail adverse secondary effects. Second, they argue that they have demonstrated that the hours-of-operation restriction will cause a "massive reduction in speech." Therefore, they argue, § 2907.40 seeks to reduce secondary effects by reducing the amount of speech — measured in hours of operation of the adult businesses — in direct proportion to any secondary effects ameliorated.

21

On the first point, the General Assembly did consider some evidence, including prior court cases, reports and studies from other jurisdictions and anecdotal testimony, that secondary effects of adult businesses are greater during the late night hours. As discussed above, this evidence provides sufficient basis, even if not overwhelming, to conclude that sexually oriented businesses cause secondary effects late at night that are different in severity or scope from those caused at other times of day. This conclusion is significantly bolstered by this Circuit's prior cases upholding hours-of-operation restrictions. *See Richland Bookmart II*, 555 F.3d at 519; *Sensations*, 526 F.3d at 294, 299; *Deja Vu of Cincinnati*, 411 F.3d at 789-91; *Richland Bookmart I*, 137 F.3d at 438, 440-41.

On the second point, Plaintiffs offered testimony at the preliminary injunction hearing about the quantity of speech that the hours-of-operation provision would suppress, arguing that it amounts to a "massive reduction." They measured this in terms of economic effect of the law by explaining that prior to passage of § 2907.40, adult bookstores in Ohio did a significant amount of business, measured in millions of dollars per year, during the hours they will now be required to remain closed. Plaintiffs also offered evidence that "juice bars" — establishments that provides nude dancing but do not sell alcoholic beverages — generate the majority of their revenues between 11:00 P.M. to 4:00 A.M., and so may become unprofitable if subject to the law.

Evidence of a regulation's economic impact is not directly relevant to the First Amendment inquiry. *See Deja Vu of Nashville*, 274 F.3d at 397 ("[T]he relevant inquiry is not whether the Ordinance will cause any economic impact on the sexually oriented businesses. Although . . . compliance with the Ordinance will cut into the plaintiffs' profits, the plaintiffs have failed to introduce any evidence showing that they will not have a reasonable opportunity to operate their establishments."); *DLS, Inc.*, 107 F.3d at 413 ("[T]he inquiry for First Amendment purposes is not

22

concerned with economic impact. In our view, the First Amendment requires only that [the city] refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city." (quoting *Renton*, 475 U.S. at 54)). Plaintiffs assert, however, that the evidence of lost sales during the early morning hours is *indicative* of the quantity of speech suppressed, and is not offered to prove loss of profits, per se. We assess this claim under Justice Kennedy's proportionality analysis laid out in *Alameda Books*.[8] *729, Inc.*, 515 F.3d at 491. Under the *729, Inc.* approach, this court must ask whether the restriction leaves the "quantity and accessibility of protected speech substantially intact," *id.* at 492 (quoting *Alameda Books*, 535 U.S. at 449-50), and must ensure that it "is reasonably likely to cause a substantial reduction in secondary effects while reducing speech very little." *Id.* at 493 (quoting *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring)).

The hours-of-operation restriction requires that sexually oriented businesses close for six hours each day (42 hours per week), leaving 18 hours per day (126 hours per week) when the

---

[8]The district court relied on *Center for Fair Public Policy v. Maricopa County*, 336 F.3d 1153 (9th Cir. 2003), which upheld an hours-of-operation restriction against a challenge similar to that at issue here. There, the Ninth Circuit decided that the hours-of-operation restriction was constitutional because it left open "ample alternative channels for communication." *Id.* at 1170 (citation omitted). The Ninth Circuit concluded that Justice Kennedy's proportionality analysis, which was adopted in the context of a case involving zoning restrictions on sexually oriented businesses, was not applicable in a challenge to hours-of-operation restrictions. The court reasoned that "the application of Justice Kennedy's proportionality analysis to this particular type of secondary effects law would invalidate all such laws, and we are satisfied that he never intended such a result. His proportionality requirement was simply not designed with this particular type of restriction in mind." *Id.* at 1163.

The Ninth Circuit's reasoning is foreclosed in this Circuit by *729, Inc v. Kenton County Fiscal Court*, which held that Justice Kennedy's proportionality analysis is binding law in secondary effects cases. 515 F.3d at 491. Thus, the district court's reliance on *Center for Fair Public Policy* was misplaced.

businesses may remain open. This is less restrictive than the hours-of-operation restriction upheld

in *Richland Bookmart I*, which required closure between midnight and 8:00 AM Monday through

Saturday and all day on Sunday, amounting to 72 hours per week (leaving 96 hours per week when

the businesses could remain open). 137 F.3d at 438, 440-41. Similarly, in *Deja Vu of Cincinnati*,

this court upheld a regulation allowing such businesses to remain open for just "twelve hours a day,

six days a week." 411 F.3d at 791; *see also Sensations*, 526 F.3d at 294, 299 (upholding prohibition

on sexually oriented businesses operating between 2:00 AM and 7:00 AM). Under these precedents,

§ 2907.40 does leave the quantity of speech substantially intact.

Plaintiffs argue, however, that once Justice Kennedy's proportionality analysis is correctly

applied, the hours-of-operation restriction cannot be sustained because the reduction in secondary

effects is small while the diminution in the availability of speech is large. With regard to the adult

bookstores, this argument fails. To the extent that the secondary effects of sexually oriented

businesses, including adult bookstores, are more serious late at night, the closure of those businesses

between midnight and 6:00 AM addresses those effects while leaving ample time–18 hours per

day–when that speech remains available. Plaintiffs have not established that the hours-of-operation

restriction will block a significant amount of access to speech. Individuals seeking to take advantage

of these stores may do so during their remaining open hours, when the asserted secondary effects are

less severe. Further, at oral argument Plaintiffs' counsel conceded that none of the adult bookstores

in Ohio closed down as a result of the hours of operation restriction, indicating that the effect of the

law is not as dire as feared. Plaintiffs fail to distinguish the instant case from prior Sixth Circuit

cases upholding hours-of-operation restrictions, except insofar as they argue that proportionality

24

analysis requires a different outcome on the record presented here.  The record does not support such a finding.

Proportionality analysis also fails to invalidate the law with respect to adult cabarets. Plaintiffs argue that "[t]he statute destroys the juice bars' business model by forcing them to close during the very hours that the vast majority of their patrons attend the constitutionally protected performances presented at them."  It is true that the premise of the law must not be that the affected businesses will close.  *See Alameda Books*, 535 U.S. at 450-51 (Kennedy, J., concurring).  On the other hand, the First Amendment is not concerned with economic effects.  *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 78 (1976) (Powell, J., concurring).  Juice bars are able to offer nude entertainment for 18 hours per day or, alternatively, to offer non-nude entertainment for 24 hours per day.  It is not clear that if following passage of § 2907.40 juice bars can no longer successfully market their business model, the overall quantity of erotic speech will have diminished.  *See DLS, Inc.*, 107 F.3d at 413 ("[W]e consider the economic effects of the ordinance in the aggregate, not at the individual level; if the ordinance were intended to destroy the market for adult cabarets, it might run afoul of the First Amendment, but not if it merely has adverse effects on the individual theater."); *see also Deja Vu of Nashville*, 274 F.3d at 397 ("Although we do not doubt that compliance with the Ordinance will cut into the plaintiffs' profits, the plaintiffs have failed to introduce any evidence showing that they will not have a reasonable opportunity to operate their establishments.").  If juice bars close, erotic dancing will be able to shift more heavily toward alcohol-serving establishments providing nude and semi-nude entertainment until midnight and scantily clad entertainment after midnight.  Thus, under the proportionality analysis, the restriction "is reasonably likely to cause a substantial reduction in

secondary effects while reducing speech very little." *729, Inc.*, 515 F.3d at 493. This court has upheld hours-of-operation restrictions on juice bars in cases decided after *Alameda Books*, and Plaintiffs do not successfully distinguish the present case. *See Deja Vu of Cincinnati*, 411 F.3d at 789-91.

## IV

### A

Plaintiffs argue that the definitions of "adult bookstore [and] adult video store" and "adult cabaret" contained in § 2907.40(A)(1) and (A)(2) are unconstitutionally overbroad on their face. A law is unconstitutionally overbroad, and thus must be invalidated, when it "prohibits a substantial amount of protected speech both in an absolute sense and relative to the statute's plainly legitimate sweep." *Entm't Prods., Inc. v. Shelby Cnty.*, 588 F.3d 372, 379 (6th Cir. 2009) (quoting *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) and *United States v. Williams*, 553 U.S. 285, 293 (2008)). "Overbreadth doctrine exists to allay the concern that the threat of enforcement of an overbroad law may deter or chill constitutionally protected speech." *J.L. Spoons, Inc v. Dragani*, 538 F.3d 379, 383 (6th Cir. 2008). Facial invalidation of a law under the overbreadth doctrine should be sparing and careful however, *Richland Bookmart, Inc. v. Knox Cnty.* (*Richland Bookmart II*), 555 F.3d 512, 522 (6th Cir. 2009), because "there are substantial social costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 120 (2003). For this reason, "the Supreme Court has 'vigorously enforced the requirement that a statute's overbreadth be substantial.'" *Entm't Prods.*, 588 F.3d at 379 (quoting *Williams*, 553 U.S. at 292). Thus, for a law to be judged facially overbroad, Plaintiffs must "demonstrate from the text of [the

26

statute] and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally." *Id.* (quoting *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988)).

Although this standard sets a high bar, this Circuit "has not shied away from invalidating a regulatory scheme in its entirety when the threat of impermissible applications and the consequent chilling effect unambiguously warranted this remedy." *Id.* at 380. Such invalidation of a law on overbreadth grounds is appropriate when the language of the law is not "readily susceptible to a limiting construction." *Odle v. Decatur Cnty.*, 421 F.3d 386, 396 (6th Cir. 2005). If a law's language lends itself to an interpretation that avoids unconstitutional applications, it may be upheld. However, this court will "not rewrite statutes to create constitutionality," *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994), and so will not "accept a construction where to do so would amount to rewriting state or local law — an enterprise the federal courts are not empowered to undertake." *Odle*, 421 F.3d at 397 (citing *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988)).

### B. The Definition of "Adult Bookstore" Is Not Unconstitutionally Overbroad

Section 2907.40(A)(1) defines "'[a]dult bookstore' or 'adult video store'" to mean

> a commercial establishment that has as a significant or substantial portion of its stock in trade or inventory in, derives a significant or substantial portion of its revenues from, devotes a significant or substantial portion of its interior business or advertising to, or maintains a substantial section of its sales or display space for the sale or rental, for any form of consideration, of books, magazines, periodicals, or other printed matter, or photographs, films, motion pictures, video cassettes, compact discs, slides, or other visual representations, that are characterized by their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas.

27

Plaintiffs argue that this definition sweeps up businesses that deal only partially in sexually oriented materials but do not produce secondary effects, including neighborhood video stores that rent X-rated films, businesses like Borders that a have section devoted to the sale of romance novels, and drug stores, grocery stores and other retail establishments that sell adult-oriented materials such as pornographic magazines. This is so, they argue, because all of these businesses "have 'sections of [their] sales or display space' of adult materials that can easily be characterized as 'substantial.'"

Plaintiffs urge that *Executive Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783 (6th Cir. 2004), dictates the result in the instant case. There, this court struck down as overbroad the following definition of adult bookstore:

> An establishment having as a substantial or significant portion of its stock in trade, books, magazines, and other periodicals [and media] which are distinguished or characterized by their emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas," as defined herein, or an establishment with *a segment or section* devoted to the sale or display of such material.

*Id.* at 787-88 (emphasis added). It did so, however, on the basis that "establishment[s] with *a segment or section* devoted to the sale or display of [adult] materials" included "multiple establishments which would never be defined as adult bookstores in everyday English, such as a Walden's or Borders." *Id.* at 796 (emphasis added). Because there was no evidence that such businesses produced secondary effects, the definition was overbroad.

The definition in § 2907.40 is distinguishable from that at issue in *Executive Arts* because it does not contain the "*a* segment or section" language. Rather, it limits all four sub-parts of the definition with the modifier "substantial" and three sub-parts with the alternative modifier "significant." The question here, then, is whether a significant number of establishments that do not

28

produce secondary effects (like major bookstore chains or neighborhood video stores) have a "*significant or substantial portion* of [their] stock in trade or inventory in, derive[] a *significant or substantial portion* of [their] revenues from, devote[] a *significant or substantial portion* of [their] interior business or advertising to, or maintain[] a *substantial section* of [their] sales or display space for" materials characterized by nudity or sexual activities. Ohio Rev. Code Ann. § 2907.40(A)(1) (emphasis added).

Courts have upheld "significant or substantial" language against overbreadth challenges in First Amendment cases. *See World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186, 1198-99 (9th Cir. 2004) ("Cases directly addressing the phrase 'significant or substantial' in this context have upheld its validity. Moreover, this phrase is readily susceptible to a narrowing construction." (citations omitted)); *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 996-97 (7th Cir. 2002) (upholding definition of "Adult Bookstore, Adult Novelty Store, and Adult Video Store as commercial establishments that, inter alia, 'derive [ ] a significant or substantial portion or [their] revenues' from Media 'characterized by the depiction or description of' nudity or sexual activities." (some internal quotation marks omitted) (alterations in original)). Courts, including this one, have also held that laws that include "significant" or "substantial" language are not unconstitutionally vague.[9] *See 511 Detroit St., Inc. v. Kelley*, 807 F.2d 1293, 1295-96 (6th Cir. 1986); *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 187-88 (2d Cir. 2010); *Z.J. Gifts D-4, L.L.C. v. City of*

---

[9]Although doctrinally distinct, the Supreme Court has "traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983); *see also Entm't Prods.*, 588 F.3d at 379 ("The void-for-vagueness doctrine and the overbreadth doctrine vindicate overlapping values in First Amendment jurisprudence. . . . When a law implicates First Amendment freedoms, vagueness poses the same risk as overbreadth, as vague laws may chill citizens from exercising their protected rights.").

*Littleton*, 311 F.3d 1220, 1229-30 (10th Cir. 2002), *overruled on other grounds*, 541 U.S. 774 (2004).

None of these cases, however, dealt with a definition of adult bookstore or adult video store quite the same as that adopted by the State of Ohio.[10] Section 2907.40 includes not just businesses that have a "significant or substantial portion of [their] stock in trade or inventory in" adult materials, but also those that "maintain[] a substantial section of [their] sales or display space for" such articles. Although the term "significant or substantial" is readily susceptible to a limiting construction, prior cases do not squarely address whether the display-space clause of § 2907.40(A)(1) is sufficiently narrow in its reach. Plaintiffs argue that major bookstores with sections of their floor space devoted to romance novels, drugstores with sections "devoted to magazines like Playboy and Penthouse" or general-interest video stores with "a separate section of adult X rated tapes" all fall within this definition. Although the record does not provide evidence regarding whether a significant number of such establishments could fairly be considered to devote a significant portion of their floor space to sexually oriented materials, a common-sense reading of the terms "significant" and "substantial" should exclude these businesses from regulation.[11]

---

[10]State cases cited by Defendants that find "substantial or significant" language not to be overbroad similarly deal with statutory definitions somewhat narrower than Ohio's.

[11]The definition at issue here is further limited by the proviso that the printed matter or visual representations featured by these businesses must be "*characterized by* their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas." Ohio Rev. Code Ann. § 2907.40(A)(1) (emphasis added). The statute defines "characterized by" as "describing the essential character or quality of an item." *Id.* § 2907.40(A)(4). Thus, the definition can be construed to exclude businesses that make available printed or visual media where nudity or sexual activities are not a central element. The Seventh Circuit has upheld a similar restriction against an overbreadth challenge on this reasoning. *See Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 996-97 (7th Cir. 2002). The "characterized by" clause in § 2907.40(A)(1) defines the contents of the printed or visual media sold, not the nature of the businesses themselves. It thus narrows the

30

Further, to be overturned, a "statute's overbreadth [must] be substantial.'" *Entm't Prods.*, 588 F.3d at 379 (quoting *Williams*, 553 U.S. at 292).  Plaintiffs have not "demonstrate[d] from the text of [the statute] and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally." *Id.* (quoting *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988)). Therefore, the definition of "adult bookstore or adult video store" is not facially overbroad.  Should a business like Borders or a general-interest video store (businesses that do not cause secondary effects) become subject to regulation under the law, it may challenge its regulation on an as-applied basis.  *See New York v. Ferber*, 458 U.S. 747,  773-74 (1982) ("Under these circumstances, [the law] is not substantially overbroad and . . . whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which [the law's] sanctions, assertedly, may not be applied." (citation and internal quotation marks omitted) (some alterations in original)).

## C.  The Definition of "Adult Cabaret" Is Not Unconstitutionally Overbroad

Section 2907.40(A)(2) states that "[a]dult cabaret has the same meaning as in section 2907.39 of the Revised Code."  Section 2907.39(A)(3) provides:

> "Adult cabaret" means a nightclub, bar, juice bar, restaurant, bottle club, or similar commercial establishment, whether or not alcoholic beverages are served, that *regularly features* any of the following:
>
> > (a) Persons who appear in a state of nudity or seminudity;
> >
> > (b) Live performances that are characterized by the exposure of specified anatomical areas or specified sexual activities;

---

reach of § 2907.40 but does not necessarily save it from overbreadth, as it is possible that "specified sexual activities" or "specified anatomical areas" could constitute the "essential character" of X-rated videos in a neighborhood video store, romance novels, or pornographic magazines.

> (c) Films, motion pictures, video cassettes, slides, or other photographic reproductions that are distinguished or characterized by their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas.

Ohio Rev. Code Ann. § 2907.39(A)(3) (emphasis added). "Regularly features" is defined to mean "a consistent or substantial course of conduct, such that the films or performances exhibited constitute a substantial portion of the films or performances offered as a part of the ongoing business of the adult entertainment establishment." *Id.* § 2907.39(A)(11). Plaintiffs argue that this definition is overbroad because it applies to "liquor permit premises and non-liquor establishments, dinner theaters and 'similar establishments' that might present serious plays and shows that involve mere depictions of sexual activity[, as well as] nightclubs of all kinds, including comedy clubs, that might include performances with nudity or semi-nudity in them."

This court has upheld similar definitions of "adult cabaret" against overbreadth challenges. *Entm't Prods.*, 588 F.3d at 381-83 (upholding definition of "adult cabaret" limited to "establishment[s] that feature as a *principal use of [their] business*, [employees who are nude or semi-nude]" (emphasis added)); *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 300 (6th Cir. 2008) (in context of ordinance nearly identical to Ohio's law, upholding "a regulation banning total nudity in sexually oriented businesses" because it is "far narrower than a similar regulation [of nudity] applicable to the general public" outside the context of sexually oriented businesses that had been struck down in another case); *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Decatur Cnty.*, 466 F.3d 391, 397-98 (6th Cir. 2006) (upholding ordinance defining sexually oriented business as one that "regularly depict[s] material which is distinguished or characterized by an emphasis on matter depicting [nudity or sexual activity]"). Consistent with these cases, the

"regularly features" clause of the "adult cabaret" definition in § 2907.40 limits the statute so that it does not reach a substantial number of constitutionally-protected performances. Plaintiffs have failed to raise a genuine issue of material fact as to whether businesses that do not cause secondary effects, such as dinner theaters or comedy clubs, ever "regularly feature" regulated entertainment in the sense that they present it as a "consistent or substantial course of conduct, such that the films or performances exhibited constitute a substantial portion of the films or performances offered as a part of the ongoing business of the adult entertainment establishment." Ohio Rev. Code Ann. § 2907.39(A)(11). Under this definition, it is not enough that a venue regularly feature entertainment including nudity or sexual activity in the sense that they present such material recurrently. Rather, it must be presented "consistent[ly]" *and* such entertainment must constitute a substantial proportion of the venue's overall offerings. This definition is sufficiently limited that it is unlikely to reach a large number of establishments that do not cause secondary effects, and thus that may not be constitutionally regulated by the law. The definition of adult cabaret is not facially overbroad.

V

Plaintiffs also challenge § 2907.40(C)(2) to the extent that it prohibits entertainers who are nude or semi-nude from touching each other during the course of a performance. Although Plaintiffs' brief is unclear as to the First Amendment theory under which they seek to challenge the no-touch provision, their counsel clarified at oral argument that we should analyze their argument as an overbreadth challenge.

The statute states:

> No employee who regularly appears nude or seminude on the premises of a sexually oriented business, while on the premises of that sexually oriented business and while nude or seminude, shall knowingly touch a patron . . . or another employee . . . or the

33

clothing of a patron . . . or another employee . . . or allow a patron . . . or another employee . . . to touch the employee or the clothing of the employee.

Ohio Rev. Code Ann. § 2907.40(C)(2). The law thus prohibits any performer who is nude or semi-nude from touching or being touched by another performer, whether the second performer is clothed or not.

This court has twice upheld similar prohibitions on erotic performers touching each other. In *DLS, Inc. v. City of Chattanooga*, 107 F.3d 403 (6th Cir. 1997), this court upheld an ordinance providing that:

> No entertainer, employee or customer shall be permitted to have any physical contact with any other [sic] on the premises during any performance and all performances shall only occur upon a stage at least eighteen inches (18["]) above the immediate floor level and removed at least six feet (6') from the nearest entertainer, employee and/or customer.

*Id.* at 406 (first alteration in original). The court construed the plaintiffs' argument to be that the buffer-zone requirement violated the *O'Brien* test. It thus did not discuss whether the ordinance violated the overbreadth doctrine. The court also did not discuss the constitutionality of the ordinance as applied to banning contact between entertainers, but rather focused on the ban on contact between entertainers and customers.

More recently, in *Entertainment Productions*, *Inc. v. Shelby County*, 588 F.3d 372 (6th Cir. 2009), we addressed an overbreadth challenge to a similar statute. The statute at issue in *Entertainment Productions* provided: "'No entertainer, employee, or customer shall be permitted to have any physical contact with any other on the premises during any performance,' and to that effect, 'all performances shall only occur . . . removed at least six feet (6') from the nearest entertainer, employee, or customer.'" *Id.* at 393 (alteration in original). The plaintiffs' overbreadth

34

challenge asserted that the statute unconstitutionally interfered with performers' ability to convey their erotic messages through dance. We rejected this challenge, concluding that the plaintiffs failed to demonstrate a "substantial number of unconstitutional applications" of the restriction. *Id.* at 394.

We find no meaningful basis on which to distinguish the instant case from *Entertainment Productions*. Although Plaintiffs here offered evidence that some physical contact between performers communicates a message and constitutes expression within the meaning of the First Amendment, the plaintiffs in *Entertainment Productions* made the same argument and presented proofs as well.[12] Plaintiffs here made no greater showing of a "substantial number of unconstitutional applications" of the restriction than did the plaintiffs in *Entertainment Productions*, and thus their overbreadth challenge must fail.

## VI

Plaintiffs argue that the plain language of § 2907.40 excludes adult bookstores and video stores from the hours-of-operation restriction. The hours-of-operation restriction applies to all "sexually oriented businesses." Ohio Rev. Code Ann. § 2907.40(B). The definition of "sexually oriented business," found at § 2907.40(A)(15), includes adult bookstores and adult video stores. But that definition also includes language that, Plaintiffs argue, excludes bookstores and video stores from the statute's reach: "'Sexually oriented business' means an adult bookstore, adult video store, adult cabaret, adult motion picture theater, sexual device shop, or sexual encounter center, *but does*

---

[12]Dr. Judith Hanna, an expert in dance and the communicative aspects of dance, testified about the messages that exotic dance performances communicate. Joseph Hall, who works with adult cabarets, also described communicative touching between performers, including in the course of skits entered into a national competition. Dr. Hanna testified in *Entertainment Productions* as well.

*not include a business solely by reason of its showing, selling, or renting materials that may depict sex.*" *Id.* § 2907.40(A)(15) (emphasis added).

The definition of adult bookstore and adult video store, located at § 2907.40(A)(1), identifies adult bookstores and video stores by the contents of the materials they sell or rent: materials "characterized by their emphasis upon [sexual activities] or [nudity]." Plaintiffs thus point to a conflict: These businesses are defined in terms of their selling or renting materials that depict sex in § 2907.40(A)(1), but are apparently excluded from the definition of sexually oriented business on the same grounds in § 2907.40(A)(15).

"In all cases of statutory construction, the starting point is the language employed by [the legislature]." *Pittsburgh & Conneaut Dock Co. v. Dir., Office of Workers' Comp. Programs*, 473 F.3d 253, 266 (6th Cir. 2007). "Reliance on the literal language of the statute is not justified, however, if it leads to an interpretation which is inconsistent with the legislative intent or to an absurd result." *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995). Importantly, "[c]ourts generally construe statutes in a way to avoid making provisions meaningless." *Sakarapanee v. Dep't of Homeland Sec., U.S. Citizenship & Immigration Servs.*, 616 F.3d 595, 600 (6th Cir. 2010); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is [this Court's] duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted)).

Adopting Plaintiffs' reading of the statute would render § 2907.40(A)(1) meaningless by excepting from regulation all those businesses it purports to encompass. Because the plain language of the statute bears another meaning, however, this outcome can be avoided. Section 2907.40(A)(1) defines adult bookstores and adult video stores as commercial establishments whose inventory, revenues, interior business or advertising, or display space consists in "*significant or substantial*"

36

part of materials "*characterized by* their emphasis upon the exhibition or description of specified sexual activities or specified anatomical areas." Thus, it is not just any business that shows, sells, or rents materials depicting sex that is subject to regulation, but rather only those substantially or significantly devoted to providing materials whose "essential character or quality" is to depict sex or nudity. *See* § 2907.40(A)(4) (defining "characterized by"). Establishments whose business consists of selling less than a significant or substantial amount of regulated material do not fall within the law. By this reading, § 2907.40(A)(15) *reinforces* the "significant or substantial" and "characterized by" language of § 2907.40(A)(1) by further clarifying that merely dealing in small amounts of adult material does not bring a business within the definition. Indeed, it would be strange for the Ohio General Assembly to enact a regulation on the hours of operation of adult bookstores and video stores, and in the same regulation exempt all such businesses.

We therefore affirm the district court's rejection of this argument.

**VI**

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.